T.C. Memo. 2006-36


UNITED STATES TAX COURT


PK VENTURES, INC. AND SUBSIDIARIES, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent*


Docket Nos. 5836-99, 6395-99,        Filed March 7, 2006.
            10154-99.


<u>B. Gray Gibbs</u>, <u>Daniel C. Johnson</u>, and <u>Philip Alan Diamond</u>,

for petitioners (at trial).  <u>Sheldon M. Kay</u> and <u>Thomas Cullinan</u>,

for petitioners (on reconsideration).

<u>Kirk S. Chaberski</u> and <u>Benjamin A. de Luna</u>, for respondent.

---

     [1] Cases of the following petitioners are consolidated
herewith:  P.K. Ventures I Limited Partnership, Robert L. Rose,
Tax Matters Partner, docket No. 6395-99; Robert L. and Alice N.
Rose, docket No. 10154-99.

     *This opinion supersedes T.C. Memo. 2005-56, which is
withdrawn by order served this date, as a result of a motion for
reconsideration filed subsequent to the release of T.C. Memo.
2005-56.

MEMORANDUM FINDINGS OF FACT AND OPINION

Table of Contents

FINDINGS OF FACT ........................................ 7

    Background ........................................... 7
        A.    Rose ........................................ 7
        B.    Printon Kane and Co. and the Printon Kane
            Group, Inc. ................................. 8
        C.    PK Ventures ................................. 9
        D.    PKVI LP .................................... 11

    PK Ventures' Purchase of the Stock of SLPC, TBPC, TPC,
    and TPTC ........................................... 15

    Rose's Initial Receipt of an Equity Interest in
    PK Ventures ........................................ 25

    The Purchase of Zephyr ............................. 26

    Transfers From PK Ventures, TBPC, and TPTC to Zephyr
    and Zephyr's Bankruptcy ............................ 29
        A.    As Described in the Business's Financial
            Statements and Income Tax Returns .......... 30
            1.   1987 .................................. 30
            2.   1988 .................................. 31
            3.   1989 .................................. 32
            4.   1990 .................................. 33
        B.    Internal Revenue Service (IRS)
            Determinations ............................. 34

    Rose's Acquisition of Control of PK Ventures and
    PKVI LP ............................................ 35

    Transfers From PK Ventures to the Zephyr Purchasers .. 42
        A.    As Described in the Financial Statements
            and Income Tax Returns for PK Ventures and
            PKV&S ...................................... 43
        B.    As Described in the Roses' Income Tax
            Returns .................................... 46
        C.    IRS Determinations ......................... 47

    Transfers to PKVI LP ............................... 47
        A.    Transfers From Unrelated Parties to
            PKVI LP .................................... 47

B. Transfers From PK Ventures and/or Its
Subsidiaries to PKVI LP ................... 55
   1. As Described in the Business's
Financial Statements and Income Tax
Returns ............................... 58
     a. 1986 ........................... 58
     b. 1987 ........................... 59
     c. 1988 ........................... 60
     d. 1989 ........................... 61
     e. 1990 ........................... 63
     f. 1991 ........................... 64
     g. 1992 ........................... 66
     h. 1993 ........................... 67
   2. IRS Determinations ................... 67

Other Circumstances Surrounding PK Ventures'
Operations and Financial Arrangements ................ 70
   A. Going Concern Notes in the Business's
Financial Statements ....................... 70
     1. PK Ventures, SLPC, TBPC, and TPTC ..... 70
     2. PKVI LP ............................. 70
   B. Litigation Involving SLPC, TBPC, and TPTC .. 72
   C. Transfers From Rose to PK Ventures ......... 73

Rose's Wages for 1986 Through 1993 ................... 74
   A. Wages Received From Printon Kane and the
Printon Kane Group ......................... 76
   B. Wages Recorded on PK Ventures' Books and
Records ...................................... 76
   C. Wages Reported on Income Tax Returns ....... 79
   D. IRS Determinations ......................... 82

PK Ventures' Share of PKVI LP's Items of Income and
Loss ................................................... 85
   A. As Reported on PK Ventures' Schedules K-1 .. 85
   B. As Reported on the Income Tax Returns for
PK Ventures and PKV&S ...................... 86
   C. IRS Determinations ......................... 87

The Roses' Share of PKVI LP's Items of Income and
Loss ................................................... 88
   A. As Reported on Rose's Schedules K-1 ........ 88
   B. As Reported on the Roses' Income Tax
Returns ...................................... 89
   C. IRS Determinations ......................... 92

The Roses' Share of Zephyr's Items of Income and
Loss ................................................... 94
    A.    As Reported on Rose's Schedules K-1 ........ 94
    B.    As Reported on the Roses' Income Tax
        Returns ..................................... 95
    C.    IRS Determinations ......................... 96

Transactions Involving SLPC, TPC, and the Roses
During 1994 and 1995 ................................ 97
    A.    As Described in SLPC and the Roses' Income
        Tax Returns ................................ 99
    B.    IRS Determinations ......................... 100

Imposition of Accuracy-Related Penalties by the IRS .. 101

OPINION ......................................................... 102

Procedural Matters .................................. 102

Issue #1--Transfers From PK Ventures to the Zephyr
        Purchasers ................................. 104

Issue #2--Transfers From PK Ventures, TBPC, and TPTC
        to PKVI LP ................................. 111

Issue #3--Transfers From PK Ventures, TBPC, and TPTC
        to Zephyr .................................. 118

Issues #4 and #5--Partners' Basis in PKVI LP ......... 119

Issue #6--The Roses' Basis in Their Zephyr Interest .. 123

Issue #7--The Roses' Basis in Their SLPC Interest .... 132

Issue #8--Reasonable Compensation ................... 138

Issue #9--Penalties ................................. 151

COHEN, <u>Judge</u>:  Respondent determined deficiencies and penalties with respect to the Federal income taxes for petitioner PK Ventures, Inc. and Subsidiaries (PKV&S), for 1990, 1991, 1992, and 1993 as follows:

|       |            | Penalty      |
| Year  | Deficiency | Sec. 6662(a) |
|-------|------------|--------------|
| 1990  | $211,278   | $2,269       |
| 1991  | 791,480    | 9,517        |
| 1992  | 649,700    | 1,316        |
| 1993  | 750,743    | --           |

By Notice of Final Partnership Administrative Adjustment (FPAA) dated January 11, 1999, respondent determined an upward adjustment of $100,661 with respect to the ordinary income of P.K. Ventures I Limited Partnership (PKVI LP) for 1991. Robert L. Rose (Rose), the designated tax matters partner for PKVI LP, filed a Petition for Readjustment of Partnership Items Under Code Section 6226.

Respondent determined deficiencies, an addition to tax, and penalties with respect to the Federal income taxes for petitioners Robert L. and Alice N. Rose (the Roses) for 1990, 1991, 1992, 1993, 1994, and 1995 as follows:

|       |            | Addition to Tax  | Penalty      |
| Year  | Deficiency | Sec. 6651(a)(1)  | Sec. 6662(a) |
|-------|------------|------------------|--------------|
| 1990  | $11,729    | --               | $2,346       |
| 1991  | 90,133     | --               | 18,027       |
| 1992  | 503,928    | --               | 100,786      |
| 1993  | 177,286    | --               | 35,457       |
| 1994  | 248,981    | --               | --           |
| 1995  | 397,096    | $8,446           | --           |

The principal issues tried and briefed in these consolidated cases were:

(1) Whether a transfer of $1 million from PK Ventures, Inc. (PK Ventures), to 10 individuals, 9 of whom were shareholders of

PK Ventures, in 1987 to enable them to purchase Zephyr Rock & Lime, Inc. (Zephyr), was a bona fide loan and, if so, whether that debt ever became worthless (Issue #1);

(2) whether transfers of funds from PK Ventures and/or its subsidiaries to PKVI LP prior to and during 1990 and during 1991 were bona fide loans and, if so, whether such debts ever became worthless (Issue #2);

(3) whether transfers of funds from PK Ventures and two of its subsidiaries to Zephyr prior to 1990 were bona fide loans and, if so, whether such debts ever became worthless (Issue #3);

(4) whether PK Ventures had sufficient basis in its PKVI LP interest during 1990, 1991, 1992, and 1993 to deduct the losses that it claimed from PKVI LP on PKV&S's consolidated Federal income tax returns for those years (Issue #4);

(5) whether the Roses had sufficient basis in their PKVI LP interest during 1990, 1991, 1992, 1993, 1994, and 1995 to deduct the losses that they claimed from PKVI LP on their joint Federal income tax returns for those years (Issue #5);

(6) whether the Roses had sufficient basis in their Zephyr interest during 1990, 1991, and 1992 to deduct the losses that they claimed from that S corporation on their joint Federal income tax returns for those years (Issue #6);

(7) whether the Roses had sufficient basis in their St. Louis Pipeline Corp. interest during 1994 and 1995 to deduct

the losses that they claimed from that S corporation on their joint Federal income tax returns for those years (Issue #7);

(8) whether the compensation that Rose received from PKV&S during 1992 and 1993 was reasonable (Issue #8); and

(9) whether the Roses are liable for accuracy-related penalties under section 6662(a) for 1990, 1991, 1992, and 1993 (Issue #9).

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Most amounts have been rounded to the nearest dollar.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. The principal place of business of PKV&S was in Sarasota, Florida, at the time that the petition was filed at docket No. 5836-99. The principal place of business of PKVI LP was in Tampa, Florida, at the time that the petition was filed at docket No. 6395-99. The Roses resided in Florida at the time that the petition was filed at docket No. 10154-99.

Background

A. Rose

Rose obtained a bachelor's degree in physics from Lancaster University in England, an M.B.A. and a master's degree in

education from Lehigh University, and a master's degree from the University of Pennsylvania. Prior to 1985, Rose was employed by Evantash Associates, Chemical Bank, Soloman Bros., Thompson McKenan, Kidder Peabody, J.J. Lowry & Co., and Community College of Philadelphia, among others. Through his employment, Rose gained experience in budgeting, financial futures, hedging transactions, foreign currencies, and loan transactions.

B.  <u>Printon Kane and Co. and the Printon Kane Group, Inc.</u>

Printon Kane and Co. (Printon Kane), a Delaware limited partnership, was, at all relevant times, in the business of dealing in bonds and other investment opportunities. Printon Kane's business was eventually transferred to the Printon Kane Group, Inc. (Printon Kane Group), a Delaware corporation, during 1989.

Rose began working for Printon Kane in 1985 and was a full-time employee of Printon Kane through 1988. Rose remained employed by Printon Kane during 1989 and by the Printon Kane Group during 1989 and 1990. Rose worked in the area of corporate finance at Printon Kane and the Printon Kane Group. In that capacity, Rose acted as a loan broker and would attempt to find lenders to fund small hydroelectric projects, cogeneration projects, and coal mining projects. In addition, Rose's duties at Printon Kane and the Printon Kane Group included seeking out and developing investment opportunities for the firm.

C. <u>PK Ventures</u>

On or about September 12, 1986, PK Ventures was organized as a Delaware corporation for the purposes of acquiring, owning, leasing, holding, operating, maintaining, and disposing of assets such as pipelines and alternate energy facilities and engaging in any and all activities related or incidental thereto.  Rose was responsible for organizing PK Ventures as part of his duties to develop investment opportunities for Printon Kane.  Sometime before Rose organized PK Ventures, Rose and Printon Kane's management had agreed that he would receive an equity interest in PK Ventures as part of his compensation for arranging this investment opportunity for the firm.

PK Ventures was initially authorized to issue 1,000 shares of stock.  As of September 16, 1986, PK Ventures had issued all of those authorized shares to 11 individuals.  These initial owners of PK Ventures included G. Clifford McCarthy, Jr. (McCarthy), and 10 individuals who were either partners in or employees of Printon Kane--Amos Beason (Beason), Francis Cerosky (Cerosky), Robert Grimmig (Grimmig), Thomas Kane (Kane), Thomas Kane, Jr. (Kane Jr.), Eugene Kirkwood (Kirkwood), Louis Krutoy (Krutoy), Joseph Mannello (Mannello), Joel Marshall (Marshall), and John Parker (Parker).  As of that date, PK Ventures' stock was owned in the following proportions:

| Shareholder | Number of Shares Owned | Percentage of Shares Owned |
|---|---|---|
| McCarthy | 3 | .3% |
| Beason | 6 | .6 |
| Cerosky | 36 | 3.6 |
| Grimmig | 156 | 15.6 |
| Kane | 407 | 40.7 |
| Kane Jr. | 21 | 2.1 |
| Kirkwood | 16 | 1.6 |
| Krutoy | 160 | 16.0 |
| Mannello | 24 | 2.4 |
| Marshall | 21 | 2.1 |
| Parker | 150 | 15.0 |

The purchase price for these shares was $0.50 per share.

On September 15, 1986, Rose was elected by the shareholders of PK Ventures as its sole director. Rose then elected himself as the president, treasurer, and secretary of the corporation. Rose held the positions of sole director, president, treasurer, and secretary of PK Ventures and operated PK Ventures out of his office at Printon Kane until he resigned from those positions in November 1988. Krutoy replaced Rose as president of PK Ventures from November 1988 through March 1990. Although he resigned the position of president of PK Ventures, Rose continued to run the day-to-day operations of PK Ventures from his office at Printon Kane or the Printon Kane Group from November 1988 through March 1990. He then regained the positions of sole director and president of PK Ventures and held those positions through 1993. Rose's duties for PK Ventures and later for PK Ventures and its wholly owned subsidiaries--St. Louis Pipeline Corp. (SLPC), Tampa Bay Pipeline Co. (TBPC), Tampa Pipeline Corp. (TPC), and Tampa

Pipeline Transport Co. (TPTC)--included handling cash management functions, payroll, insurance and risk management functions, customer relations, and marketing.

During 1990, 1991, 1992, and 1993, PK Ventures operated as a C corporation, used the accrual method of accounting, and was the holding company for SLPC, TBPC, TPC, and TPTC.  During 1991, 1992, and 1993, PK Ventures and its subsidiaries employed approximately 20 people.  Neither PK Ventures nor any of its subsidiaries paid any dividends to their shareholders from 1986 through 1993.

D.  PKVI LP

On September 15, 1986, Rose, as sole director of PK Ventures, adopted a resolution that PK Ventures, Rose, and Herbert Patrick (Patrick), as general partners, would form PKVI LP for the purposes of acquiring, owning, leasing, holding, operating, maintaining, mortgaging, and disposing of hydroelectric, cogeneration, and other energy projects.  PKVI LP was subsequently organized as a Delaware limited partnership. Rose was responsible for organizing PKVI LP as part of his duties to develop investment opportunities for Printon Kane.  Sometime before Rose organized PKVI LP, Rose and Printon Kane's management had agreed that he would receive an equity interest in PKVI LP as part of his compensation for arranging this investment opportunity for the firm.

The initial partners in PKVI LP included PK Ventures, Patrick, Rose, McCarthy, and 10 other individuals who were associated with Printon Kane--Beason, Cerosky, Grimmig, Kane, Kane Jr., Kirkwood, Krutoy, Mannello, Marshall, and Parker. Under the terms of the Agreement of Limited Partnership of PK Ventures I Limited Partnership (agreement of limited partnership), these partners made initial capital contributions to PKVI LP in the following amounts and held the following interests in PKVI LP as of September 15, 1986:

| Partner | Initial Capital Contribution | Participating Percentage | Limited or General |
|---|---|---|---|
| PK Ventures | $500 | 1.000% | General |
| Patrick | 0 | 40.000 | General |
| Rose | 0 | 30.000 | General |
| McCarthy | 148 | .087 | Limited |
| Beason | 297 | .174 | Limited |
| Cerosky | 1,782 | 1.044 | Limited |
| Grimmig | 7,722 | 4.524 | Limited |
| Kane | 20,146 | 11.803 | Limited |
| Kane Jr. | 1,040 | .609 | Limited |
| Kirkwood | 792 | .464 | Limited |
| Krutoy | 7,920 | 4.640 | Limited |
| Mannello | 1,188 | .696 | Limited |
| Marshall | 1,040 | .609 | Limited |
| Parker | 7,425 | 4.350 | Limited |

The initial capital contributions to PKVI LP totaled $50,000. No other amounts transferred to PKVI LP were identified as capital contributions on its books. The terms of the agreement of limited partnership required that, as of the end of each fiscal year of the partnership, PKVI LP pay to each of its partners interest on their capital contributions (as adjusted for

any subsequent contributions and withdrawals) at a rate equal to the greater of (1) the prime rate as published in the Wall Street Journal on the last business day of the fiscal year plus 2 percent or (2) such other floating or fixed rate authorized by PK Ventures, the corporate general partner of PKVI LP.

In their roles as general partners of PKVI LP, Patrick was responsible for the management of the partnership's daily operations, and Rose was responsible for the partnership's ongoing financial activities. The terms of the agreement of limited partnership provided that neither Rose nor Patrick would be compensated for their services to the partnership. As corporate general partner of PKVI LP, PK Ventures had, inter alia, the exclusive right, power, and authority to authorize distributions of cash on behalf of PKVI LP. PK Ventures also had the exclusive right, power, and authority, subject to written approval of the partnership's limited partners holding at least 67 percent of the aggregate voting percentages of the limited partners, to do the following: (1) Make calls for additional capital contributions on behalf of PKVI LP; (2) permit a withdrawal of capital by any partner; (3) admit an additional partner to the partnership; (4) permit the withdrawal of any partner from the partnership; (5) designate any additional investments for the partnership and determine the participating percentages of the partners in such additional investments;

(6) sell or otherwise dispose of all or substantially all of the partnership's property attributable to any investment; (7) permit any agreement between the partnership and any general partner or any person controlled by or controlling or under common control with a general partner; and (8) permit the transfer or assignment, in whole or in part, by a partner of his interest in the partnership.

The terms of the agreement of limited partnership provided that the general partners of PKVI LP were under no obligation to make any additional capital contributions to the partnership in response to any capital calls made on behalf of the partnership by PK Ventures. A general partner's participating percentage could not be decreased as a result of not making any additional capital contributions to PKVI LP, but it could be increased as a result of making such a contribution. A limited partner's participating percentage could be adjusted upward or remain the same if that partner did make an additional capital contribution to PKVI LP in response to a capital call, or it could be adjusted downward if that partner did not make an additional capital contribution in response to a capital call.

Patrick, Rose, and PK Ventures were the general partners of PKVI LP from September 15, 1986, until sometime in 1989. During that time, PK Ventures owned a 1-percent interest, Rose owned a 30-percent interest, and Patrick owned a 40-percent interest.

Sometime during 1989, Patrick relinquished his interest in PKVI LP. As a result of Patrick's withdrawal from PKVI LP, Rose and PK Ventures became the partnership's only general partners. At that time, Rose held a 70-percent general partnership interest in PKVI LP. From May 1988 through January 1990, PK Ventures was both a 1-percent general partner and a 4.35-percent limited partner of PKVI LP.

PK Ventures' Purchase of the Stock of SLPC, TBPC, TPC, and TPTC

On December 10, 1986, PK Ventures entered into separate Stock Purchase Agreements for the purchase of 100 percent of the outstanding stock of SLPC, TBPC, TPC, and TPTC. At the time that PK Ventures entered into these agreements, SLPC, TBPC, and TPC were owned by Joyce Western Corp. (Joyce Western), and TPTC was owned by Joyce Western, Kathleen Biondo, Christine Joyce, Helma Joyce, and James Joyce (the TPTC sellers). At all relevant times, these corporations were engaged in the following operations: (1) SLPC owned a pipeline that transported aviation fuel from Illinois to the Lambert Airport in St. Louis, Missouri; (2) TBPC and TPTC owned pipelines that transported anhydrous ammonia from the port of Tampa Bay, Florida, to Hillsborough County, Florida, and Polk County, Florida; and (3) TPC held a general partnership interest and/or a limited partnership interest in Tampa Pipeline Limited Partnership, a business that operated an aviation fuel pipeline that serviced the Tampa

International Airport.  As of December 10, 1986, TBPC and TPTC owned two of the four existing anhydrous ammonia pipelines in the United States.  Also as of that date, TBPC had leased the use of its pipeline to W.R. Grace & Co. and Royster Co. (Royster), and TPTC had leased the use of its pipeline to International Minerals & Chemical Corp.

Under the terms of the Stock Purchase Agreements, PK Ventures agreed to pay the following base purchase prices for the stock of SLPC, TBPC, TPC, and TPTC:

| Corporation | Base Purchase Price |
| --- | --- |
| SLPC | $150,000 |
| TBPC | 1,000,000 |
| TPC | 50,000 |
| TPTC | 1,300,000 |

The parties agreed that these base purchase prices would be adjusted to reflect the amount by which each corporation's current assets differed from its current liabilities as of the closing date.

On December 30, 1986, PK Ventures agreed to pay to Joyce Western the following portions of the base purchase prices for the stock of SLPC, TBPC, and TPC on the transaction's closing date:

| Corporation | Amount Paid |
| --- | --- |
| SLPC | $40,000 |
| TBPC | 350,000 |
| TPC | 10,000 |

In addition, PK Ventures agreed to deliver to Joyce Western nonnegotiable promissory notes in the following principal amounts for the balances of the base purchase prices:

| Corporation | Promissory Note Amount |
|---|---|
| SLPC | $110,000 |
| TBPC | 650,000 |
| TPC | 40,000 |

Also on December 30, 1986, PK Ventures entered into an Interim Loan Agreement (ILA) with Norstar Bank (Norstar) in connection with its purchase of the stock of SLPC, TBPC, TPC, and TPTC. The ILA was a precursor to the permanent financing arrangement that PK Ventures was to enter into with Norstar in connection with this transaction. The ILA required Norstar, inter alia, to make a loan to PK Ventures in the form of a revolving line of credit in the maximum principal amount of $1.6 million. This loan was secured by an irrevocable letter of credit that the Summit Trust Co. (Summit Trust) issued in favor of PK Ventures on December 31, 1986. The terms of the loan required that all outstanding principal amounts bear interest at a rate equal to three-fourths of 1 percent above Norstar's stated prime rate, that payments of accrued interest and outstanding principal amounts be made monthly, and that the entire outstanding principal balance plus accrued interest become due and payable at the time that the permanent financing was finalized. Advances under this loan were to be made, inter alia,

to pay to James Joyce or Joyce Western a total of $600,000 in two installments--$400,000 was due to be paid at the closing of the loan, and the balance was due to be paid at the earlier of the closing of the permanent financing or February 1, 1987.

The ILA also set forth the details of the permanent financing arrangement that was being negotiated between PK Ventures and Norstar. As set forth in the ILA, Norstar had agreed to make one term loan to SLPC in the amount of $1.1 million and one or more term loans to TBPC, TPC, and/or TPTC in the total amount of $10.5 million. The purpose of these term loans was, inter alia, to refinance the indebtedness that SLPC, TBPC, TPC, and TPTC owed to Norstar. In addition to these term loans, Norstar agreed to establish a 5-year revolving line of credit in the maximum principal amount of $2.5 million for PK Ventures ($2.5 million revolving line of credit). Under the terms of the permanent financing arrangement, the term loans to SLPC, TBPC, TPC, and TPTC and the first $1.3 million of outstanding principal on the $2.5 million revolving line of credit were to be secured by a pledge of all of the stock of SLPC, TBPC, TPC, and TPTC as well as a first mortgage on and security interest in all of the assets of those corporations.

On December 31, 1986, PK Ventures closed on the purchase of the stock of SLPC, TBPC, and TPC from Joyce Western. On that date, PK Ventures executed documents entitled "Non-Negotiable

Promissory Note" in favor of Joyce Western for the balances of the base purchase prices for the stock of SLPC, TBPC, and TPC. The terms of the Non-Negotiable Promissory Note for the balance of the base purchase price for the stock of SLPC required that the principal amount bear interest at a rate of 9 percent, that a $10,000 principal installment payment be made on January 31, 1987, and that the remaining principal balance plus accrued interest become due and payable no later than February 15, 1987. The terms of the Non-Negotiable Promissory Note for the balance of the base purchase price for the stock of TBPC required that the principal amount bear interest at a rate of 9 percent, that a $185,000 principal installment payment be made on January 31, 1987, and that the remaining principal balance plus accrued interest become due and payable no later than February 15, 1987. The terms of the Non-Negotiable Promissory Note for the balance of the base purchase price for the stock of TPC required that the principal amount bear interest at a rate of 9 percent, that a $5,000 principal installment payment be made on January 31, 1987, and that the remaining principal balance plus accrued interest become due and payable no later than February 15, 1987. These promissory notes were subordinate to the indebtedness incurred by PK Ventures, SLPC, TBPC, TPC, and TPTC to Norstar in connection with PK Ventures' acquisition of SLPC, TBPC, TPC, and TPTC.

Also on December 31, 1986, PK Ventures executed documents entitled "Subordinated Note" in favor of the TPTC sellers in exchange for the stock of TPTC. The Subordinated Notes were issued in the following amounts and were, in the aggregate, equal to the base purchase price for the stock of TPTC:

| TPTC Seller | Subordinated Note Amount |
|---|---|
| Joyce Western | $780,000 |
| Kathleen Biondo | 130,000 |
| Christine Joyce | 130,000 |
| Helma Joyce | 130,000 |
| James Joyce | 130,000 |

The terms of the Subordinated Notes required that the principal balances bear interest at a rate of 7.6923 percent, that payments of accrued interest be made monthly beginning on February 1, 1987, and that the principal balances become due and payable on January 1, 1992. The Subordinated Notes were subordinate to the indebtedness incurred by PK Ventures, SLPC, TBPC, TPC, and TPTC to Norstar in connection with PK Ventures' acquisition of SLPC, TBPC, TPC, and TPTC.

On or about February 3, 1987, SLPC, TBPC, and TPTC executed documents entitled "Promissory Note" in favor of Norstar in which they promised to pay to Norstar the principal amounts of $1.1 million, $6.5 million, and $4 million, respectively. The terms of SLPC's Promissory Note to Norstar required that the outstanding principal balance bear interest at a rate of 10.25 percent, that the interest on the outstanding principal

amount be calculated on the basis of a 360-day year, that payments of principal and accrued interest be made in equal quarterly installments of $55,532 beginning on February 15, 1987, and that any remaining balance of principal and accrued interest become due and payable on February 3, 1994. The terms of TBPC's Promissory Note to Norstar required that the outstanding principal balance bear interest at a rate of 10.40 percent, that the interest on the outstanding principal amount be calculated on the basis of a 360-day year, that payments of principal and accrued interest be made in equal monthly installments of $87,345 beginning on March 15, 1987, and that any remaining balance of principal and accrued interest become due and payable on February 3, 1997. The terms of TPTC's Promissory Note to Norstar required that the outstanding principal balance bear interest at a rate of 10.40 percent, that the interest on the outstanding principal amount be calculated on the basis of a 360-day year, that payments of principal and accrued interest be made in equal monthly installments of $53,751 beginning on February 15, 1987, and that any remaining balance of principal and accrued interest become due and payable on February 3, 1997.

Also on or about February 3, 1987, PK Ventures executed a document entitled "Master Note" in favor of Norstar in which it promised to pay to Norstar the principal amount of $2.5 million or, if less, the aggregate unpaid principal amount of all

advances made by Norstar to PK Ventures under the $2.5 million revolving line of credit.  The terms of this Master Note required that all outstanding principal amounts bear interest at a rate equal to three-fourths of 1 percent above Norstar's stated prime rate, that the interest on the outstanding principal amounts be calculated on the basis of a 360-day year, that PK Ventures make payments of all accrued interest on the outstanding principal amounts on a monthly basis, and that the line of credit expire on January 1, 1992, with all amounts thereunder becoming immediately due and payable.

On February 9, 1987, Norstar sent a letter to Rose to inform him that it had transferred a total of $12.5 million in loan proceeds to PK Ventures' Norstar account.  This letter indicated that, effective February 3, 1987, Norstar had advanced the following loans:

| Borrower | Loan Amount |
| --- | --- |
| SLPC | $1,100,000 |
| TBPC | 6,500,000 |
| TPTC | 4,000,000 |
| PK Ventures | 900,000 |

Norstar made the $900,000 advance to PK Ventures under the $2.5 million revolving line of credit.  In addition, the letter indicated that Norstar had "closed-out" previously outstanding notes of SLPC, TBPC, TPC, and TPTC totaling $12,493,009. Pursuant to Rose's instructions, Norstar debited PK Ventures' account for this amount.

On or about June 23, 1987, TBPC executed a document entitled "Restated Promissory Note" in favor of Contel Credit Corp. (Contel) in which it promised to pay to Contel the principal amount of $5.3 million. This Restated Promissory Note restated and superseded the Promissory Note that TBPC had executed in favor of Norstar on February 3, 1987, in the original principal amount of $6.5 million. The terms of the Restated Promissory Note required that the outstanding principal balance bear interest at a rate of 9.9 percent through June 14, 1992, and 10.25 percent thereafter, that the interest on the outstanding principal amount be calculated on the basis of a 360-day year, that payments of principal and accrued interest be made monthly beginning on July 15, 1987, and that any remaining balance of principal and accrued interest become due and payable on December 15, 1995.

Also on or about June 23, 1987, TPTC executed a document entitled "Consolidation Note" in favor of Contel in which it promised to pay to Contel the principal amount of $6.5 million. The principal amount of this Consolidation Note included and consolidated the principal balance of the Promissory Note that TPTC had executed in favor of Norstar on February 3, 1987, in the original principal amount of $4 million as well as the principal balance of an Additional Advance Note that TPTC had executed in favor of Contel in the original principal amount of $2.5 million.

The terms of the Consolidation Note required that the outstanding principal balance bear interest at a rate of 9.9 percent through June 14, 1992, and 10.25 percent thereafter, that the interest on the outstanding principal amount be calculated on the basis of a 360-day year, that payments of principal and accrued interest be made monthly beginning on July 15, 1987, and that any remaining balance of principal and accrued interest become due and payable on December 15, 1996.

Also on or about June 23, 1987, PK Ventures agreed to guarantee the loans between TBPC and Contel and between TPTC and Contel (collectively, the Contel debt) and to pledge all of the stock of TBPC, TPC, and TPTC to secure the Contel debt. In addition, TBPC, TPC, and TPTC agreed to encumber all of their assets to secure the Contel debt, and PK Ventures decided that TBPC, TPC, and TPTC no longer had to guarantee or to secure the first $1.3 million of outstanding principal on the $2.5 million revolving line of credit or any other indebtedness owed by SLPC, TBPC, TPC, or TPTC to Norstar. PK Ventures also decided that SLPC no longer had to guarantee or to secure the first $1.3 million of outstanding principal on the revolving line of credit.

PK Ventures, SLPC, TBPC, TPC, and TPTC (jointly referred to as petitioner PKV&S) filed consolidated Federal income tax returns for 1987 through 1993. Prior to 1990, PK Ventures, SLPC,

TBPC, TPC, and TPTC each prepared separate financial statements. Beginning in 1990 and continuing through 1993, PK Ventures, SLPC, TBPC, TPC, and TPTC prepared consolidated financial statements. These consolidated financial statements will be referred to as PKV&S's consolidated financial statements. Any references to PK Ventures in this Opinion should not be construed to include its subsidiaries.

Rose's Initial Receipt of an Equity Interest in PK Ventures

On or about August 19, 1987, PK Ventures adopted a resolution to amend its Certificate of Incorporation to increase the number of shares of stock that it was authorized to issue from 1,000 to 20,000. In connection with this amendment, the 150 shares of PK Ventures stock owned by Parker and the 36 shares of PK Ventures stock owned by Cerosky were redeemed by PK Ventures at a price of $0.50 per share. Also in connection with this amendment, Rose and the PK Ventures shareholders were given the opportunity to purchase 9,186 shares of PK Ventures stock at a price of $0.05 per share. As a result of these transactions, the stock of PK Ventures was owned in the following proportions as of August 19, 1987:

| Shareholder | Additional Shares Acquired | Total Shares Owned After Acquisition | Percentage of Shares Owned After Acquisition |
|---|---|---|---|
| McCarthy | 7 | 10 | .10% |
| Beason | 14 | 20 | .20 |
| Grimmig | 1,073 | 1,229 | 12.29 |
| Kane | 2,802 | 3,209 | 32.09 |
| Kane Jr. | 48 | 69 | .69 |
| Kirkwood | 37 | 53 | .53 |
| Krutoy | 1,101 | 1,261 | 12.61 |
| Mannello | 56 | 80 | .80 |
| Marshall | 48 | 69 | .69 |
| Rose | 4,000 | 4,000 | 40.00 |
| Total | 9,186 | 10,000 | 100.00 |

The Purchase of Zephyr

Zephyr, a Florida corporation, operated as an S corporation during 1987. Zephyr's primary business was mining, processing, and selling limestone from a quarry that it owned in Pasco County, Florida. As of August 19, 1987, Zephyr's balance sheets showed that its current liabilities exceeded its current assets by $6,030,986.

Sometime before August 20, 1987, PK Ventures entered into a stock purchase agreement with Elli M.A. Mills (Mills) to purchase all of Zephyr's issued and outstanding stock. Prior to closing this agreement, it was decided that, for certain business and tax reasons, PK Ventures would assign its rights under the stock purchase agreement to 10 individuals--Beason, Cerosky, Grimmig, Kane, Kane Jr., Krutoy, Mannello, Marshall, McCarthy, and Rose (collectively, the Zephyr purchasers)--9 of whom were shareholders of PK Ventures (i.e., Cerosky was no longer a

shareholder of PK Ventures) and 9 of whom were associated with Printon Kane.  McCarthy was neither a partner in nor an employee of Printon Kane.

On or about August 20, 1987, PK Ventures transferred $1 million to the Zephyr purchasers.  Of this $1 million, Rose received $400,000.  Rose and the other Zephyr purchasers used this $1 million to purchase Zephyr's stock from Mills, to cure delinquent payments to Zephyr's creditors, and to provide Zephyr with working capital.  As of August 20, 1987, the Zephyr purchasers owned interests in Zephyr and in PK Ventures as follows:

| Shareholder | Zephyr Shares Owned | Percentage of Zephyr Owned | Percentage of PK Ventures Owned |
|---|---|---|---|
| Beason | 36 | .610% | .20% |
| Cerosky | 18 | .305 | 0 |
| Grimmig | 708 | 12.000 | 12.29 |
| Kane | 1,451 | 24.593 | 32.09 |
| Kane Jr. | 177 | 3.000 | .69 |
| Krutoy | 708 | 12.000 | 12.61 |
| Mannello | 177 | 3.000 | .80 |
| Marshall | 177 | 3.000 | .69 |
| McCarthy | 88 | 1.492 | .10 |
| Rose | 2,360 | 40.000 | 40.00 |
| Total | 5,900 | 100.000 | 99.47 |

PK Ventures obtained the $1 million that it transferred to the Zephyr purchasers from Summit Trust (Summit Trust loan).  An entity named Printon Kane Government Securities pledged a $1 million certificate of deposit as collateral for the Summit Trust loan.  PK Ventures accounted for the Summit Trust loan by

crediting a liability account, "Due to Summit Trust", and debiting an asset account, "Due from Shareholders".

Also on or about August 20, 1987, PK Ventures and Zephyr agreed to enter into a Management and Guaranty Inducement Agreement. Under the terms of the Management and Guaranty Inducement Agreement, PK Ventures and Zephyr agreed that PK Ventures would provide certain management services to Zephyr, guarantee certain debts of Zephyr and the Zephyr purchasers, and indemnify Mills with respect to his existing guarantees of Zephyr's debt. In connection with the Management and Guaranty Inducement Agreement, PK Ventures agreed to guarantee the following: (1) $500,000 of the purchase price to be paid by the Zephyr purchasers for Zephyr's stock; (2) payment of the amounts due under Zephyr's promissory note to NCNB National Bank of Florida in the original principal amount of $2,615,000; (3) payment of the amounts due under Zephyr's promissory note to Southeast Bank, N.A., in the principal amount $950,000; and (4) liabilities that Zephyr incurred in the ordinary course of its business.

On or about November 23, 1987, Summit Trust approved a 6-month renewal of the Summit Trust loan. The terms of the renewal required that the principal balance of the Summit Trust loan bear interest at a rate of 1.5 percent over the rate of the $1 million certificate of deposit being held as collateral, that

payments of accrued interest be made monthly beginning on December 20, 1987, and that the principal balance and accrued interest become due and payable on May 20, 1988. On or about June 6, 1988, the Summit Trust loan was renewed until May 20, 1989, under terms similar to those contained in the renewal of November 23, 1987.

Transfers From PK Ventures, TBPC, and TPTC to Zephyr and Zephyr's Bankruptcy

After its acquisition by the Zephyr purchasers in 1987, Zephyr continued to operate as a limestone mining business. During 1987 and 1988, Zephyr received transfers totaling $2,281,818 from the following sources:

| Source | Amount |
| --- | --- |
| Printon Kane | $1,450,000 |
| PK Ventures | 446,215 |
| TBPC | 263,296 |
| TPTC | 122,307 |

During 1988, Zephyr unsuccessfully attempted to obtain financing from ITT Commercial Finance Corp. and Tarmac Florida, Inc.

On December 6, 1988, Zephyr filed for bankruptcy under Chapter 11 of the Bankruptcy Code. Among the creditors listed in its bankruptcy documents were Printon Kane, PK Ventures, TBPC, and TPTC. The bankruptcy documents indicated that PK Ventures, TBPC, and TPTC had transferred $831,818 to Zephyr, as set forth above. PK Ventures, TBPC, and TPTC each filed claims in Zephyr's bankruptcy proceeding on September 12, 1989. Copies of canceled

checks and promissory notes were attached to each of these claims as substantiation of the amounts owed.

Zephyr's bankruptcy was finalized in late 1989. Sometime between the time that the bankruptcy was finalized and the end of March 1990, a third party purchased Zephyr's assets, and the proceeds of that sale were distributed to specific secured and unsecured creditors of Zephyr. Neither Printon Kane, PK Ventures, TBPC, nor TPTC received any of those proceeds.

As of December 31, 1990, the general ledger account used by PK Ventures to account for certain transfers that it had made to Zephyr had a net or remaining balance of $64,888.

A.  As Described in the Business's Financial Statements and Income Tax Returns

1.  1987

No direct references were made and no explanations were provided in Zephyr's Form 1120S, U.S. Income Tax Return for an S Corporation, for 1987 as to the amounts that Zephyr received from Printon Kane, PK Ventures, TBPC, or TPTC during that year. On the Schedule L, Balance Sheets, attached to that return, Zephyr reported $6,961,306 of "Mortgages, notes, bonds payable in less than 1 year" and $902,669 of "Mortgages, notes, bonds payable in 1 year or more" as of the end of 1987. There were no amounts separately identified as interest payments made and/or imputed by Zephyr to PK Ventures, TBPC, or TPTC on Zephyr's Form 1120S for 1987.

No direct references were made and no explanations were provided in PK Ventures, TBPC, or TPTC's financial statements for the year ended December 31, 1987, as to the amounts that PK Ventures, TBPC, and TPTC transferred to Zephyr during that year.

No direct references were made and no explanations were provided in PKV&S's consolidated income tax return for 1987 as to the amounts that PK Ventures, TBPC, and TPTC transferred to Zephyr during that year.  There were also no amounts separately identified as interest payments received and/or imputed by PK Ventures, TBPC, or TPTC from Zephyr on PKV&S's consolidated income tax return for 1987.

### 2. 1988

No direct references were made and no explanations were provided in Zephyr's Form 1120S for 1988 as to the amounts that Zephyr received from Printon Kane, PK Ventures, TBPC, or TPTC during that year.  On the Schedule L attached to that return, Zephyr reported $7,318,462 of "Mortgages, notes, bonds payable in less than 1 year", $677,132 of "Other current liabilities", and $730,189 of "Mortgages, notes, bonds payable in 1 year or more" as of the end of 1988.  There were no amounts separately identified as interest payments made and/or imputed by Zephyr to PK Ventures, TBPC, or TPTC on Zephyr's Form 1120S for 1988.

No direct references were made and no explanations were provided in PK Ventures, TBPC, or TPTC's financial statements for the year ended December 31, 1988, as to the amounts that PK Ventures, TBPC, and TPTC transferred to Zephyr during that year.  Furthermore, no mention of Zephyr's bankruptcy was made in PK Ventures, TBPC, or TPTC's financial statements for the year ended December 31, 1988.

On the Schedule L attached to PKV&S's consolidated income tax return for 1988, TBPC and TPTC reported a total of $385,603 due from Zephyr under "Other assets" as of the end of that year. Of this amount, $263,296 was attributable to TBPC and $122,307 was attributable to TPTC.  These amounts were described as "DUE FROM UNCONSOLIDATED SUBSIDIARIES".  There were no amounts separately identified as interest payments received and/or imputed by PK Ventures, TBPC, or TPTC from Zephyr on PKV&S's consolidated income tax return for 1988.

### 3. <u>1989</u>

No direct references were made and no explanations were provided in Zephyr's Form 1120S for 1989 as to the amounts that Zephyr received from Printon Kane, PK Ventures, TBPC, or TPTC during that year.  Furthermore, no Schedule L was attached to this return.  There were no amounts separately identified as interest payments made and/or imputed by Zephyr to PK Ventures, TBPC, or TPTC on Zephyr's Form 1120S for 1989.

No direct references were made and no explanations were provided in PK Ventures, TBPC, or TPTC's financial statements for the year ended December 31, 1989, as to the amounts that PK Ventures, TBPC, and TPTC transferred to Zephyr during that year. Furthermore, no mention of Zephyr's bankruptcy was made in PK Ventures, TBPC, or TPTC's financial statements for the year ended December 31, 1989.

PKV&S claimed a $953,652 bad debt deduction on its consolidated income tax return for 1989 for cash transfers that PK Ventures, TBPC, and TPTC had made to Zephyr. PKV&S did not attach to this return an explanation for claiming this bad debt deduction. On the Schedule L attached to PKV&S's consolidated income tax return for 1989, PK Ventures and its subsidiaries reported a total of $90,000 due from Zephyr under "Other assets" as of the end of that year. This amount was described as "DUE FROM UNCONSOLIDATED SUBSIDIARIES". There were no amounts separately identified as interest payments received and/or imputed by PK Ventures, TBPC, or TPTC from Zephyr on PKV&S's consolidated income tax return for 1989.

### 4. 1990

On its Form 1120S for 1990, Zephyr represented that "No income or expense items where [sic] reported on the tax return due to the fact that the corporation was not solvent after the completion of the bankruptcy."

PKV&S claimed a $664,888 bad debt deduction on its consolidated income tax return for 1990 for cash transfers that PK Ventures, TBPC, and TPTC had made to Zephyr and for the cash transfers that PK Ventures had made to the nine Zephyr purchasers other than Rose.  With respect to this bad debt deduction, $64,888 was attributable to the cash transfers that PK Ventures and/or its subsidiaries had made to Zephyr in prior years.  PKV&S did not attach to this return an explanation for claiming this bad debt deduction.

B.  Internal Revenue Service (IRS) Determinations

The IRS determined that PKV&S was not allowed to claim a bad debt deduction of $953,652 on its consolidated income tax return for 1989 for cash transfers that PK Ventures and/or its subsidiaries had made to Zephyr because it had not established that a true debtor-creditor relationship was intended by these transfers.  Furthermore, the IRS determined that, if a debt had been intended, PKV&S had not established that such debt had become worthless during 1989.  The effect of this determination was to reduce the net operating loss carryover that PKV&S could report on its consolidated income tax return for 1990 (as amended) from $1,023,245 to $69,593.  Accordingly, the IRS increased PKV&S's taxable income by $953,652 for 1990.

The IRS also determined that PKV&S was not allowed to claim a bad debt deduction of $64,888 on its consolidated income tax

return for 1990 for cash transfers that PK Ventures and/or its subsidiaries had made to Zephyr because it had not established that a true debtor-creditor relationship was intended by these transfers. Furthermore, the IRS determined that, if a debt had been intended, PKV&S had not established that such debt had become worthless during 1990. Accordingly, the IRS increased PKV&S's taxable income by $64,888 for 1990.

The IRS determined that, with respect to the $64,888 of transfers from PK Ventures and/or its subsidiaries to Zephyr for which PKV&S had claimed a bad debt deduction on its consolidated income tax return for 1990, 40 percent of that amount constituted a constructive dividend to the Roses in 1990. Consequently, the IRS increased the Roses' taxable income by $25,955 for 1990.

Rose's Acquisition of Control of PK Ventures and PKVI LP

At the beginning of 1990, PK Ventures was experiencing difficulty servicing its debt. On February 16, 1990, Kane, Kane Jr., Krutoy, Mannello, Rose, and PK Ventures executed a document entitled "Agreement" (debt service agreement) whereby PK Ventures agreed to repay the loans that it had outstanding with Norstar and Summit Trust according to the schedule set forth in that agreement. As of that date, PK Ventures had an $800,000 outstanding principal balance with respect to its $2.5 million revolving line of credit with Norstar and had not repaid the Summit Trust loan.

According to the schedule set forth in the debt service agreement, PK Ventures agreed to pay the outstanding principal balance of the $2.5 million revolving line of credit plus any accrued interest within 5 days from the date of the debt service agreement. Furthermore, PK Ventures agreed to make a $400,000 payment on the Summit Trust loan at the earlier of September 30, 1990, or the date that Rose acquired a majority interest in PK Ventures. PK Ventures was to repay the remaining $600,000 of the Summit Trust loan at the loan's maturity date, 12 months from the date of the debt service agreement or as extended by Summit Trust. The debt service agreement also contained the following provision:

> 3.3 Compensation. Until October 1, 1990, Robert Rose's salary, as Chief Executive Officer, will be fixed at $80,000 per annum, payable bi-weekly.

The debt service agreement provided that PK Ventures was to borrow funds from Rose if it did not have sufficient funds to make the scheduled payments to Norstar and Summit Trust. If PK Ventures borrowed any funds from Rose, it was required to execute a promissory note in Rose's favor and to secure repayment of the loan by placing a priority lien (as permitted) on all of its assets. In addition, any such loans between Rose and PK Ventures were to be secured by an escalating pledge of the shares of PK Ventures' stock owned by Kane, Kane Jr., Krutoy, and Mannello in an amount identified in a Pledge Agreement.

Certificates of deposit had been pledged as security for the loans that PK Ventures had taken out with Norstar and Summit Trust. Specifically, an $800,000 certificate of deposit secured the outstanding principal balance of the $2.5 million revolving line of credit and a $1 million certificate of deposit from Printon Kane Government Securities secured the Summit Trust loan. Under the terms of the debt service agreement, PK Ventures was to instruct Norstar and Summit Trust to release a like amount of the certificates of deposit that they had been holding as collateral to the receiving agent for Kane, Kane Jr., Krutoy, and Mannello as it made the scheduled payments to these institutions.

As contemplated by the debt service agreement, PK Ventures borrowed $800,000 from Rose on February 16, 1990, in order to make its scheduled payment to Norstar. Rose obtained a portion of the funds for this loan by placing a $675,000 mortgage on his New Jersey residence with First Fidelity Bank (First Fidelity). Rose gathered the remaining $125,000 for this loan from other sources. In exchange for this $800,000 loan, PK Ventures executed documents entitled "Promissory Note" and "Security Agreement" in favor of Rose. The terms of the Promissory Note required that the principal amount bear interest at a rate equal to 3 percent above First Fidelity's stated prime rate, that PK Ventures make payments of accrued interest on a monthly basis beginning March 1, 1990, and that the principal balance become

due and payable on September 30, 1990.  In addition, Kane, Kane

Jr., Krutoy, and Mannello executed a document entitled "Pledge

Agreement" in favor of Rose.  Under the terms of the Pledge

Agreement, Kane, Kane Jr., Krutoy, and Mannello agreed to pledge

44 percent of their total shares of PK Ventures' stock to Rose in

order to secure repayment of Rose's $800,000 loan to PK Ventures.

As a result of entering into the Pledge Agreement, Kane, Kane.

Jr., Krutoy, and Mannello pledged a combined total of 2,032.36

shares of PK Ventures' stock to Rose.

Also on February 16, 1990, Kane, Kane Jr., Krutoy, and

Mannello executed a document entitled "Voting Trust Agreement"

whereby they agreed to place all of their shares of PK Ventures'

stock into a voting trust in exchange for voting trust

certificates.  The voting trust certificates indicated their

ownership rights in the shares of stock held by the trustee.

Rose was designated as trustee of this voting trust and was given

sole authority to vote the shares.  As trustee of the voting

trust, Rose had voting rights to 86.19 percent of the shares of

PK Ventures' stock.  (The Voting Trust Agreement granted Rose

voting rights to 46.19 percent of PK Ventures' stock; he already

held voting rights to 40 percent of the shares of PK Ventures'

stock prior to becoming trustee of the voting trust.)  The shares

of PK Ventures' stock placed into the voting trust included the

shares that had been pledged to Rose under the Pledge Agreement.

The voting trust was to last for 21 years from February 16, 1990, unless terminated earlier by the death, resignation, or incapacity of Rose.

Also on February 16, 1990, Kane, Kane Jr., Krutoy, and Mannello executed documents entitled "Assignment" whereby they agreed to transfer all of their respective interests in PKVI LP to PK Ventures. In sum, they transferred a 17.748-percent limited partnership interest in PKVI LP to PK Ventures. With that transfer, PK Ventures held a 22.098-percent limited partnership interest and a 1-percent general partnership interest in PKVI LP.

PK Ventures satisfied its obligation to Norstar with the $800,000 loan that it received from Rose. PK Ventures repaid this loan by making various cash payments to Rose and to First Fidelity.

On December 7, 1990, a document entitled "Stock Redemption Agreement" was executed by Cerosky (as a holder of an interest in PKVI LP), the shareholders of PK Ventures (i.e., Beason, Grimmig, Kane, Kane Jr., Kirkwood, Krutoy, Mannello, Marshall, McCarthy, and Rose), and PK Ventures. Under the terms of the Stock Redemption Agreement, (1) PK Ventures agreed to redeem a total of 5,295 shares of its stock from the shareholders of PK Ventures other than Rose (the withdrawing shareholders); (2) the withdrawing shareholders agreed to sell, assign, and transfer

their ownership interests in all of PK Ventures' subsidiaries (i.e., SLPC, TBPC, TPC, and TPTC) to PK Ventures; and (3) Beason, Cerosky, Grimmig, Kirkwood, Marshall, and McCarthy agreed to transfer their ownership interests in PKVI LP to PK Ventures.

At the completion of the stock redemption on December 7, 1990, Kane and Rose were the only shareholders of PK Ventures, with Rose owning 85.016 percent of PK Ventures' outstanding shares. Rose and PK Ventures also became the only owners of PKVI LP. In sum, Beason, Cerosky, Grimmig, Kirkwood, Marshall, and McCarthy transferred a 6.902-percent limited partnership interest in PKVI LP to PK Ventures. Consequently, as of December 7, 1990, PK Ventures owned a 1-percent general partnership interest and the entire 29-percent limited partnership interest in PKVI LP, and Rose owned a 70-percent general partnership interest in PKVI LP.

As consideration for the stock redemption and purchases described above, PK Ventures agreed to repay the Summit Trust loan based on the following schedule: $400,000 on December 7, 1990, $50,000 within 9 months of December 7, 1990, and $550,000 within 1 year of December 7, 1990. In addition, PK Ventures agreed to instruct Summit Trust to release a like amount of the $1 million certificate of deposit that it held as collateral for the Summit Trust loan to the receiving agent for the withdrawing

shareholders with each scheduled payment that it made.  The parties to the Stock Redemption Agreement also agreed as follows:

> 7.1 <u>Release.  The Company, Rose, and the Shareholders acknowledge that there are certain obligations and indebtedness existing between Rose and the Company on the one hand and the Shareholders on the other hand.  It is the intent of the parties in executing this Agreement that all such debts and obligations, except as otherwise provided herein, be hereby expressly extinguished.  Accordingly, the Shareholders hereby release Rose and the Company and the Company and Rose, jointly and severally, release the Shareholders with respect to any and all claims which the Shareholders on the one hand may have against Rose and/or the Company (including obligations of the Company to repay the indebtedness to Summit as set forth in the Agreement among Rose, the Certificate Holders and the Company dated February 16, 1990) or, respecting claims which Rose and/or the company may have against the Shareholders excepting, as to all parties, claims and obligations arising pursuant to this Agreement, the</u> * * * <u>Pledge Agreement, the Voting Trust Agreement, and any agreement executed in conjunction with this Agreement</u> * * *

In accordance with the Stock Redemption Agreement, Rose loaned $400,000 to PK Ventures on December 7, 1990.  Rose paid the $400,000 directly to Summit Trust.  Rose refinanced his New Jersey home in order to obtain the funds for this loan.  In exchange for the $400,000 loan, PK Ventures gave Rose a promissory note.  PK Ventures accounted for the promissory note by debiting the liability account to Summit Trust and crediting the account "Due To/From PKV/RLR".  PK Ventures repaid the $400,000 directly to Rose's mortgagee.

The series of agreements executed on February 16, 1990, were amended, but not voided, by the Stock Redemption Agreement.

Under the terms of the Stock Redemption Agreement, the 705 shares of PK Ventures' stock that were not redeemed from Kane remained subject to both the Voting Trust Agreement and the Pledge Agreement.

Also on December 7, 1990, Rose, PK Ventures, and the Printon Kane Group executed a document entitled "Agreement" (litigation agreement) whereby they agreed to share the litigation costs incurred to sue Raymond James & Associates. The litigation subject to the litigation agreement involved the business and activities of Zephyr. As a result of Zephyr's bankruptcy, the Zephyr purchasers had lost all of the cash that they had contributed to Zephyr.

Transfers From PK Ventures to the Zephyr Purchasers

PK Ventures did not receive promissory notes from the Zephyr purchasers in exchange for the $1 million that it transferred to them. No accrued interest attributable to this transfer was posted to PK Ventures' general ledger or reported in its audited financial statements.

The Zephyr purchasers did not repay any portion of the $1 million that had been transferred to them from PK Ventures. PK Ventures neither took legal action against the Zephyr purchasers to force repayment of the $1 million transfer nor did it attempt to negotiate a partial collection of this amount with any of the Zephyr purchasers. PK Ventures issued Forms 1099 to

each of the Zephyr purchasers reflecting cancellation of indebtedness income.

On August 5, 1991, the Roses sold their home in New Jersey for $422,500.  The Roses purchased a home in Florida for $481,555 sometime between August 5, 1991, and March 16, 1992.  The Roses paid the entire $481,555 purchase price with cash from their savings.

On December 31, 1991, PK Ventures' financial books and records indicated that Rose owed $437,469 to PK Ventures.  This balance was reduced to zero by "reclassifying" $400,000 as a bad debt attributable to Rose's portion of the $1 million that PK Ventures had transferred to the Zephyr purchasers and by "reclassifying" the remaining $37,469 as compensation expense attributable to Rose.

A.  As Described in the Financial Statements and Income Tax Returns for PK Ventures and PKV&S

Note 3 to PK Ventures' audited financial statements for the year ended December 31, 1987, stated:  "The company has advanced $1,000,000 to the stockholders.  This money was advanced for the sole purpose to acquire a company that would be compatible with the business objectives of the Company."  The same statement was included in the notes to PK Ventures' financial statements for the years ended December 31, 1988, and December 31, 1989.  A $1 million amount "Due from stockholders" was listed as an asset on PK Ventures' audited financial statements for the years ended

December 31, 1987, December 31, 1988, and December 31, 1989, respectively.

A $1 million "Loans to stockholders" amount was listed as an asset on the Schedules L attached to PKV&S's consolidated income tax returns for 1987, 1988, and 1989. There were no amounts separately identified as interest payments received and/or imputed by PK Ventures from the Zephyr purchasers on PKV&S's consolidated income tax returns for 1987 through 1989.

On its audited consolidated financial statements for the year ended December 31, 1990, PKV&S claimed a bad debt expense of $664,888, $600,000 of which was attributable to the transfers that PK Ventures had made to the nine Zephyr purchasers other than Rose. Note B to these financial statements offered the following explanation for PKV&S asserting a bad debt expense with respect to this $600,000 transfer:

> The Company advanced $1,000,000 interest free to the shareholders of the Company in 1987 which was invested in Zephyr Rock & Lime, Inc. ("Zephyr"). In March 1990, Zephyr sold all its assets and there were no funds left to distribute to shareholders after paying liabilities. Thereupon the Company ascertained that $600,000 of the advances to shareholders was uncollectible and, accordingly, charged $600,000 to 1990 operations. The remaining balance of $400,000 at December 31, 1990 is due from the Company's majority shareholder and has been netted against other advances from the shareholder.

There is no explanation in these financial statements as to what the balance of the $664,888 bad debt expense was attributable.

PKV&S claimed a $664,888 bad debt deduction on its consolidated income tax return for 1990 for cash transfers that PK Ventures, TBPC, and TPTC had made to Zephyr and for the cash transfers that PK Ventures had made to the nine Zephyr purchasers other than Rose. With respect to this bad debt deduction, $600,000 was attributable to the cash transfers that PK Ventures had made to the nine Zephyr purchasers other than Rose. PKV&S did not attach to this return an explanation for claiming this bad debt deduction. There were no amounts separately identified as interest payments received and/or imputed by PK Ventures from the Zephyr purchasers on PKV&S's consolidated income tax return for 1990.

PKV&S claimed a bad debt expense of $1,712,151 on its audited consolidated financial statements for the year ended December 31, 1991. Of this amount, $400,000 was attributable to the transfer that PK Ventures had made to Rose in connection with the Zephyr purchase. Note 2 to these financial statements offered the following explanation for PKV&S asserting a bad debt expense with respect to this $400,000 transfer:

> The Company advanced $1,000,000 interest free to the shareholders of the Company in 1987 which was invested in Zephyr Rock & Lime, Inc. (Zephyr). In March 1990, Zephyr sold all its assets and there were no funds left to distribute to shareholders after paying liabilities. Thereupon the Company ascertained that $600,000 of the advances to shareholders was uncollectible and, accordingly, charged $600,000 to 1990 operations. The remaining balance of $400,000 at December 31, 1990 was due from the Company's majority shareholder and netted

against other advances due to the shareholder.  During 1991, the remaining $400,000 was determined to be uncollectible and charged to 1991 operations.

PKV&S claimed a $1,916,246 bad debt deduction on its consolidated income tax return for 1991 for the cash transfers that PK Ventures, TBPC, and TPTC had made to PKVI LP and for the cash transfer that PK Ventures had made to Rose in connection with the Zephyr purchase.  With respect to this bad debt deduction, $400,000 was attributable to the transfer that PK Ventures had made to Rose in connection with the Zephyr purchase.  There were no amounts separately identified as interest payments received and/or imputed by PK Ventures from the Zephyr purchasers on PKV&S's consolidated income tax return for 1991.

B.  As Described in the Roses' Income Tax Returns

There were no amounts separately identified as interest payments made and/or imputed by the Roses to PK Ventures on their joint income tax returns for 1990 or 1991.  On their joint income tax return for 1991, the Roses reported $1,461,372 of cancellation of indebtedness income.  The Roses reported that $400,000 of this amount was attributable to the transfer that PK Ventures had made to Rose in connection with the Zephyr purchase.

C.  IRS Determinations

The IRS determined that PKV&S was not allowed to claim bad debt deductions of $600,000 and $400,000 on its consolidated income tax returns for 1990 and 1991, respectively, for the cash transfers that PK Ventures had made to the Zephyr purchasers because it had not established that a true debtor-creditor relationship was intended by these transfers.  Furthermore, the IRS determined that, if a debt had been intended, PKV&S had not established that such debt had become worthless during either 1990 or 1991.  Accordingly, the IRS increased PKV&S's taxable income by $600,000 for 1990 and by $400,000 for 1991.

The IRS determined that PK Ventures' transfer of $400,000 to Rose in connection with the Zephyr purchase constituted a constructive dividend to him in 1990.  Consequently, the IRS increased the Roses' taxable income by $400,000 for 1990 and determined that the Roses should not have reported $400,000 of cancellation of indebtedness income on their joint income tax return for 1991.

Transfers to PKVI LP

A.  Transfers From Unrelated Parties to PKVI LP

At the time of its organization, PKVI LP was engaged in the acquisition of three hydroelectric projects that were located in or near Bynum, North Carolina; Henrietta, North Carolina; and Columbus, Georgia, respectively.  A small portion of the

acquisition of these three hydroelectric projects was financed by the initial capital contributions that were made to PKVI LP. During the years in issue, the bulk of PKVI LP's assets consisted of hydroelectric powerplant projects in North Carolina and Georgia. PKVI LP's debts to unrelated parties were generally nonrecourse in nature and were secured by these hydroelectric properties.

As of December 31, 1986, PKVI LP had loan agreements outstanding with First Fidelity, Liberty Life Insurance Co. (Liberty Life), and Middle Georgia Fuel Products, Inc. (MGFP), as follows:

| Lender | Maturity Date | Interest Rate | Outstanding Principal Balance as of 12/31/86 |
|---|---|---|---|
| First Fidelity | Jan. 27, 1987 | 9.00% | $200,000 |
| Liberty Life | Dec. 1, 1998 | 10.50 | 672,644 |
| MGFP | July 1, 1988 | 10.00 | 328,500 |

As of that date, the outstanding principal balances of the transfers associated with these agreements totaled $1,201,144.

Of this $1,201,144, $227,326 was listed as a current liability on the Statement of Financial Condition included in PKVI LP's audited financial statements for the year ended December 31, 1986, and as "Mortgages, notes, and bonds payable in less than 1 year" on the Schedule L attached to PKVI LP's Form 1065, U.S. Partnership Return of Income, for 1986. The balance of this amount was listed as a long-term liability on the

Statement of Financial Condition included in PKVI LP's audited financial statements for the year ended December 31, 1986, and as "Mortgages, notes, and bonds payable in 1 year or more" on the Schedule L attached to PKVI LP's Form 1065 for 1986.

As of December 31, 1987, PKVI LP had loan agreements outstanding with First Fidelity, Liberty Life, MGFP, and Trio Manufacturing Co. (Trio) as follows:

| Lender | Maturity Date | Interest Rate | Outstanding Principal Balance as of 12/31/87 |
|--------|---------------|---------------|----------------------------------------------|
| First Fidelity | Feb. 1, 1988 | 10.50% | $320,000 |
| First Fidelity | Feb. 1, 1988 | 10.25 | 15,000 |
| Liberty Life | Dec. 1, 1998 | 10.50 | 645,318 |
| MGFP | July 1, 1988 | 10.00 | 328,500 |
| Trio | Mar. 12, 1988 | 10.00 | 517,500 |

As of that date, the outstanding principal balances of the transfers associated with these agreements totaled $1,826,318.

Of this $1,826,318, $1,213,953 was listed as a current liability on the Balance Sheet included in PKVI LP's audited financial statements for the year ended December 31, 1987, and as "Mortgages, notes, and bonds payable in less than 1 year" on the Schedule L attached to PKVI LP's Form 1065 for 1987.  The balance of this amount was listed as a long-term liability on the Balance Sheet included in PKVI LP's audited financial statements for the year ended December 31, 1987, and as "Mortgages, notes, and bonds payable in 1 year or more" on the Schedule L attached to PKVI LP's Form 1065 for 1987.

As of December 31, 1988, PKVI LP had the following loan agreements outstanding:

| Lender | Maturity Date | Interest Rate | Outstanding Principal Balance as of 12/31/88 |
|--------|---------------|---------------|----------------------------------------------|
| Daley Corp. | July 1, 1989 | -- | $3,416 |
| First Fidelity | Jan. 18, 1989 | 11.50% | 75,000 |
| First Fidelity | Jan. 18, 1989 | 12.00 | 50,000 |
| Liberty Life | Dec. 1, 1998 | 10.50 | 612,365 |
| Liberty Life | Apr. 1, 2001 | 10.70 | 800,000 |
| Liberty Life | Aug. 20, 2001 | 11.35 | 400,000 |
| MGFP | Mar. 31, 1990 | 10.00 | 328,500 |

As of that date, the outstanding principal balances of the transfers associated with these agreements totaled $2,269,281.

Of this $2,269,281, $193,060 was listed as a current liability on the Statement of Financial Condition included in PKVI LP's audited financial statements for the year ended December 31, 1988, and as "Mortgages, notes, and bonds payable in less than 1 year" on the Schedule L attached to PKVI LP's Form 1065 for 1988. The balance of this amount was listed as a long-term liability on the Statement of Financial Condition included in PKVI LP's audited financial statements for the year ended December 31, 1988, and as "Mortgages, notes, and bonds payable in 1 year or more" on the Schedule L attached to PKVI LP's Form 1065 for 1988.

As of December 31, 1989, PKVI LP had the following loan agreements outstanding:

|  | | | Outstanding |
| Lender | Maturity Date | Interest Rate | Principal Balance as of 12/31/89 |
| --- | --- | --- | --- |
| First Fidelity | Jan. 16, 1990 | 12.00% | $125,000 |
| MGFP | Mar. 31, 1990 | 10.00 | 328,500 |

PKVI LP entered into the $125,000 loan agreement with First Fidelity on or before October 16, 1989.

PKVI LP also had the same loan agreements outstanding with Liberty Life on December 31, 1989, as it did on December 31, 1988. The outstanding principal balances of PKVI LP's loan agreements with Liberty Life totaled $1,778,241 as of December 31, 1989; $1,652,584 of this amount was treated as long-term debt on PKVI LP's audited financial statements for the year ended December 31, 1989, and the balance was treated as a current liability.

The outstanding principal balances of the transfers associated with the agreements described in the preceding two paragraphs totaled $2,231,741 as of December 31, 1989. Of this amount, $579,157 was listed as a current liability on the Statement of Financial Condition included in PKVI LP's audited financial statements for the year ended December 31, 1989, and as "Mortgages, notes, and bonds payable in less than 1 year" on the Schedule L attached to PKVI LP's Form 1065 for 1989. The balance of this amount was listed as a long-term liability on the Statement of Financial Condition included in PKVI LP's audited financial statements for the year ended December 31, 1989, and as

"Mortgages, notes, and bonds payable in 1 year or more" on the Schedule L attached to PKVI LP's Form 1065 for 1989.

PKVI LP renegotiated its loan agreement with MGFP during 1990. The renegotiated loan agreement between PKVI LP and MGFP was for the principal balance of $401,284, an amount that included the $328,500 principal balance from their original loan agreement plus $72,784 of accrued interest.

As of December 31, 1990, PKVI LP had the following loan agreements outstanding:

| Lender | Maturity Date | Interest Rate | Outstanding Principal Balance as of 12/31/90 |
|---|---|---|---|
| Liberty Life | Dec. 1, 1998 | 10.50% | $559,372 |
| Liberty Life | Apr. 1, 2001 | 10.70 | 762,224 |
| Liberty Life | Aug. 20, 2001 | 11.35 | 387,716 |
| MGFP | Dec. 31, 1991 | 10.00 | 401,284 |

As of that date, the outstanding principal balances of the transfers associated with these agreements totaled $2,110,596.

On the Balance Sheet included in PKVI LP's audited financial statements for the year ended December 31, 1990, PKVI LP's "Current portion of long-term debt" was listed as $403,473, and its "LONG-TERM DEBT DUE AFTER ONE YEAR" was listed as $1,829,201. On the Schedule L attached to PKVI LP's Form 1065 for 1990, "Mortgages, notes, and bonds payable in less than 1 year" was listed as $425,000 as of the end of that year, and "Mortgages, notes, and bonds payable in 1 year or more" was listed as $1,685,596.

On February 15, 1991, PKVI LP and Liberty Life agreed to consolidate their three outstanding loan agreements into one agreement.  The principal balance of this consolidated loan agreement was $1,854,939, an amount that included the $1,709,312 of outstanding principal balances from the three original loan agreements between PKVI LP and Liberty Life plus $145,628 of accrued interest.  The interest rate for this consolidated loan agreement was 10.78 percent, i.e., the weighted average of the interest rates from the original loan agreements.

PKVI LP experienced difficulties with its Georgia hydroelectric facilities, City Mills and Juliette, during 1991. As a result, PKVI LP defaulted on the loan agreement it had entered with MGFP to finance the Juliette facility.  As noted above, PKVI LP and MGFP had renegotiated this loan agreement during 1990.  In addition, PKVI LP failed to make the required payments of principal on its consolidated loan agreement with Liberty Life.  These payments were scheduled to begin on August 15, 1991.

As of December 31, 1991, PKVI LP had the following loan agreements outstanding:

| Lender | Maturity Date | Interest Rate | Outstanding Principal Balance as of 12/31/91 |
|---|---|---|---|
| Liberty Life | Aug. 15, 2003 | 10.78% | $1,854,939 |
| MGFP | Dec. 31, 1991 | 10.00 | 401,284 |

As of that date, the outstanding principal balances of the transfers associated with these agreements totaled $2,256,223.

PKVI LP's financial statements for the year ended December 31, 1991, are not part of the record in these cases. On the Balance Sheets included in PKVI LP's reviewed financial statements for the year ended December 31, 1992, PKVI LP's total and current liabilities were listed as $2,334,551 as of December 31, 1991. The $2,334,551 included $2,256,223 for long-term debt in default, $76,058 for accrued expenses, and $2,270 for accounts payable. On the Schedule L attached to PKVI LP's Form 1065 for 1991, $2,256,223 was listed under "Mortgages, notes, and bonds payable in less than 1 year" as of the end of that year.

As of December 31, 1992, PKVI LP had loan agreements outstanding with Liberty Life and MGFP. As of that date, the outstanding principal balances of the transfers associated with these agreements remained $2,256,223. This entire amount was listed as a current liability on the Balance Sheets included in PKVI LP's reviewed financial statements for the year ended December 31, 1992. On the Schedule L attached to PKVI LP's Form 1065 for 1991, $335,448 was listed under "Mortgages, notes, and bonds payable in less than 1 year" as of the end of that year, and $2,528,779 was listed under "All nonrecourse loans".

As of December 31, 1993, the loan agreement that PKVI LP had with Liberty Life remained outstanding. As of that date, the outstanding principal balance of this loan agreement remained $1,854,939. This entire amount was listed as a current liability on the Balance Sheets included in PKVI LP's reviewed financial statements for the year ended December 31, 1993. There was no Schedule L attached to PKVI LP's Form 1065 for 1993.

B. Transfers From PK Ventures and/or Its Subsidiaries to PKVI LP

Between 1986 and the end of 1991, PK Ventures, TBPC, and TPTC made cash transfers to PKVI LP. On PK Ventures' general ledger, these transfers were treated as loans. Rose executed one-page documents entitled "Promissory Note" (PKVI LP promissory note) with respect to some, but not all, of these transfers. The terms of the PKVI LP promissory notes required that (1) the transfers be repaid on demand with an interest rate of either 8.75 or 9 percent; (2) payment of interest was due only with the payment of principal; and (3) payment of principal was not to be made if payment to PK Ventures would have caused PKVI LP to default or breach any other note or agreement to which PKVI LP was a party. This last provision subordinated PK Ventures' right to demand payment of the transfers to the rights of PKVI LP's creditors. Unlike the basic structure of PKVI LP's debt to unrelated parties, the PKVI LP promissory notes were not secured by the hydroelectric properties owned by PKVI LP. The PKVI LP

promissory notes were signed by Rose alone; they were neither attested to by a witness nor notarized.

On December 31, 1989, Rose executed a PKVI LP promissory note in favor of PK Ventures in which PKVI LP promised to pay PK Ventures the principal amount of $448,646 ($448,646 promissory note). The $448,646 promissory note reflected the aggregate amount of cash that had been transferred from PK Ventures, TBPC, and TPTC to PKVI LP from 1986 through 1989.

PK Ventures, TBPC, and TPTC made cash transfers to PKVI LP totaling $647,605 during 1990. On December 31, 1990, Rose executed a PKVI LP promissory note in favor of PK Ventures in which PKVI LP promised to pay PK Ventures the principal amount of $1,096,250 ($1,096,250 promissory note). The $1,096,250 promissory note reflected the aggregate amount of cash that had been transferred from PK Ventures, TBPC, and TPTC to PKVI LP from 1986 through 1990.

PK Ventures, TBPC, and TPTC made transfers to PKVI LP totaling $419,995 during 1991. On December 31, 1991, Rose executed a PKVI LP promissory note in favor of PK Ventures in which PKVI LP promised to pay PK Ventures the principal amount of $1,516,246 ($1,516,246 promissory note). The $1,516,246 promissory note reflected the aggregate amount of cash that had been transferred from PK Ventures, TBPC, and TPTC to PKVI LP from 1986 through 1991. At the time that Rose signed the $1,516,246

promissory note, he did not intend to have PKVI LP repay any of this amount to PK Ventures. In addition, Rose, as a general partner with a 70-percent interest in PKVI LP, did not intend to repay any of this amount to PK Ventures at the time that he signed the $1,516,246 promissory note.

No legal action was taken by PK Ventures against Rose to force repayment of the $1,516,246 promissory note. Rose owned approximately 85 percent of the stock of PK Ventures during 1991.

In a letter dated July 6, 1992, to Douglas W. Kroske, C.F.A., senior vice president of Liberty Capital Advisors, Inc., Rose made the following statements concerning the transfers from PK Ventures, TBPC, and TPTC to PKVI LP:

> Since 1986, PK Ventures Inc has invested over
> $1.5 million in these hydroelectric projects, and is
> willing to continue but needs some help from Liberty
> Life.  * * *
>
> *    *    *    *    *    *    *
>
> There has been a delay on the financial statements for
> the year ending 12/31/91.  During the year based on
> Ernst & Young's review, $419,996 cash was provided to
> the Partnership from PK Ventures, Inc.  Since inception
> to 12/31/91 a total amount of $1,516,246 has been
> injected, and our auditors are now going to make
> PK Ventures Inc write this off as it is an
> uncollectible claim against the Partnership.  The
> $419,996 cash of 1991, was used approximately for
> equipment and Bynum canal repairs of $225,661, and the
> balance used in payments to Liberty Life.

1.  As Described in the Business's Financial Statements and Income Tax Returns

    a.  1986

No direct references were made and no explanations were provided in PKVI LP's audited financial statements for the year ended December 31, 1986, as to the amounts that PKVI LP received from PK Ventures during that year.

On PK Ventures' Schedule K-1, Partner's Share of Income, Credits, Deductions, etc., attached to PKVI LP's Form 1065 for 1986, PK Ventures was reported to have made a $500 capital contribution to PKVI LP during that year and to have a capital account with a balance of $242 as of the end of that year.  No other direct references were made and no other explanations were provided in PKVI LP's Form 1065 for 1986 as to the amounts that PKVI LP received from PK Ventures during that year.  There were also no amounts separately identified as interest payments made and/or imputed by PKVI LP to PK Ventures on its Form 1065 for 1986.

On the Statement of Financial Condition included in PK Ventures' audited financial statements for the year ended December 31, 1986, a $242 "Investment in affiliated partnership" was listed as an asset.  This entry referred to PK Ventures' investment in PKVI LP.  The $242 was listed under "Other investments" on the Schedule L attached to PK Ventures' income tax return for 1986.  No other direct references were made and no

other explanations were provided in PK Ventures' financial statements for 1986 as to the amounts that it transferred to PKVI LP during that year.

No direct references were made and no explanations were provided in PK Ventures' income tax return for 1986 as to the amounts that it transferred to PKVI LP during that year.  There were no amounts separately identified as interest payments received and/or imputed by PK Ventures from PKVI LP on PK Ventures' income tax return for 1986.

### b.  1987

No direct references were made and no explanations were provided in PKVI LP's financial statements for 1987 as to the amounts that PKVI LP received from PK Ventures, TBPC, or TPTC during that year.  On the Balance Sheet included in PKVI LP's audited financial statements for the year ended December 31, 1987, $48,300 "Due to affiliated company" was listed as a current liability.

No direct references were made and no explanations were provided in PKVI LP's Form 1065 for 1987 as to the amounts that PKVI LP received from PK Ventures, TBPC, or TPTC during that year.  On the Schedule L attached to PKVI LP's Form 1065 for 1987, $48,300 was listed under "Other liabilities" as of the end of that year.  There were no amounts separately identified as

interest payments made and/or imputed by PKVI LP to PK Ventures, TBPC, or TPTC on its Form 1065 for 1987.

No direct references were made and no explanations were provided in PK Ventures, TBPC, or TPTC's financial statements for the year ended December 31, 1987, as to the amounts that PK Ventures, TBPC, and TPTC transferred to PKVI LP during that year.

No direct references were made and no explanations were provided in PKV&S's consolidated income tax return for 1987 as to the amounts that PK Ventures, TBPC, and TPTC transferred to PKVI LP during that year. There were no amounts separately identified as interest payments received and/or imputed by PK Ventures, TBPC, or TPTC from PKVI LP on PKV&S's consolidated income tax return for 1987.

c.  1988

Note 4 to PKVI LP's audited financial statements for the year ended December 31, 1988, stated, in pertinent part:  "At December 31, 1988, the Partnership owed $20,580 to P.K. Ventures, Inc. and $105,978 to affiliated entities which are respectively owned by the Partnerships' general partners."  On the Statement of Financial Condition included in PKVI LP's audited financial statements for the year ended December 31, 1988, $126,558 "Due to affiliated company" was listed as a current liability.

On the Schedule L attached to PKVI LP's Form 1065 for 1988, $126,558 "Due to Affiliated Company" was listed under "Other current liabilities" as of the end of that year.  There were no amounts separately identified as interest payments made and/or imputed by PKVI LP to PK Ventures, TBPC, or TPTC on its Form 1065 for 1988.

No direct references were made and no explanations were provided in PK Ventures, TBPC, or TPTC's financial statements for the year ended December 31, 1988, as to the amounts that PK Ventures, TBPC, and TPTC transferred to PKVI LP during that year.

On the Schedule L attached to PKV&S's consolidated income tax return for 1988, PK Ventures, TBPC, and TPTC reported $118,558 due from PKVI LP under "Other assets" as of the end of that year.  Of this amount, $20,580 was attributable to PK Ventures, $48,000 was attributable to TBPC, and $49,978 was attributable to TPTC.  There were no amounts separately identified as interest payments received and/or imputed by PK Ventures, TBPC, or TPTC from PKVI LP on PKV&S's consolidated income tax return for 1988.

### d.  1989

Note 4 to PKVI LP's audited financial statements for the year ended December 31, 1989, stated, in pertinent part:  "At December 31, 1989, the Partnership owed $448,646 to

P.K. Ventures, Inc. and $107,978 to companies affiliated with P.K. Ventures, Inc." On the Statement of Financial Condition included in PKVI LP's audited financial statements for the year ended December 31, 1989, $556,624 "Due to affiliated company" was listed as a liability.

No direct references were made and no explanations were provided in PKVI LP's Form 1065 for 1989 as to the amounts that PKVI LP received from PK Ventures, TBPC, or TPTC during that year. On the Schedule L attached to PKVI LP's Form 1065 for 1989, $556,624 "Due to Affiliated Company" was listed under "Other current liabilities" as of the end of that year. There were no amounts separately identified as interest payments made and/or imputed by PKVI LP to PK Ventures, TBPC, or TPTC on its Form 1065 for 1989.

No direct references were made and no explanations were provided in PK Ventures, TBPC, or TPTC's financial statements for the year ended December 31, 1989, as to the amounts that PK Ventures, TBPC, and TPTC transferred to PKVI LP during that year.

On the Schedule L attached to PKV&S's consolidated income tax return for 1989, PK Ventures and its subsidiaries reported $556,624 due from PKVI LP under "Other assets" as of the end of that year. There were no amounts separately identified as interest payments received and/or imputed by PK Ventures, TBPC,

or TPTC from PKVI LP on PKV&S's consolidated income tax return for 1989.

### e. 1990

Contrary to the terms of the PKVI LP promissory notes, Note D to PKVI LP's audited financial statements for the year ended December 31, 1990, stated that the transfers that had been received by PKVI LP from PK Ventures (totaling $1,096,250) did not bear interest.  Note D also stated that there was no stated maturity date with respect to these transfers and that PKVI LP anticipated that it would repay PK Ventures when cash was available.  On the Balance Sheets included in these financial statements, $1,096,250 "DUE TO AFFILIATED COMPANY" was listed as a liability.

On the Schedule L attached to PKVI LP's Form 1065 for 1990, $1,096,250 "DUE TO AFFILIATED COMPANIES" was listed under "Other liabilities" as of the end of that year.  On its Form 1065 for 1990, PKVI LP reported imputed interest payments totaling $67,772.  There were no amounts separately identified as interest payments made and/or imputed by PKVI LP to PK Ventures, TBPC, or TPTC on its Form 1065 for 1990.

Note C to the audited consolidated financial statements of PKV&S for the year ended December 31, 1990, stated the following:

> The Company has a receivable of $1,096,250 from
> PK Ventures I Limited Partnership ("LTD") in which it
> has a 1% general partnership interest and a 29% limited
> partnership interest.  The Company's investment in and

advances to LTD have been reduced by $75,000 under the equity method of accounting. At December 31, 1990, LTD has a deficit of $667,000 and incurred a net loss of $262,000 in 1990. The management of LTD is completing construction of certain operating facilities and believes that LTD will become profitable in the future and be able to repay the advances from the Company. The collectibility of the receivable is dependent upon future events which cannot be predicted at this time.

On the Consolidated Balance Sheets included in these financial statements, $1,027,577 for "INVESTMENT IN AND ADVANCES TO LIMITED PARTNERSHIPS" was listed as an asset. Of the $1,027,577, $1,021,250 was attributable to an amount "Due from Limited Partnership" for PK Ventures and $6,327 was attributable to an "Investment in limited partnerships" by TPC. On the Consolidated Statements of Cash Flows included in these financial statements, $539,626 for "Advances to limited partnership" was listed under investing activities.

On the Schedule L attached to PKV&S's consolidated income tax return for 1990, PK Ventures reported $1,116,250 due from PKVI LP under "Other current assets" as of the end of that year. On its consolidated income tax return for 1990, PKV&S reported that PK Ventures had imputed interest payments from PKVI LP under section 7872 totaling $67,772.

> f. 1991

PKVI LP's financial statements for the year ended December 31, 1991, are not part of the record in these cases.

On the Schedule L attached to PKVI LP's Form 1065 for 1990, no amount "DUE TO AFFILIATED COMPANIES" was listed under "Other liabilities" as of the end of that year.  On its Form 1065 for 1991, PKVI LP reported imputed interest payments totaling $100,661.  There were no amounts separately identified as interest payments made and/or imputed by PKVI LP to PK Ventures, TBPC, or TPTC on its Form 1065 for 1991.

PKV&S claimed a bad debt expense of $1,712,151 on its audited consolidated financial statements for the year ended December 31, 1991.  Of this amount, $1,312,151 was attributable to the transfers that PK Ventures had made to PKVI LP in 1991 and prior years.  Note 3 to these financial statements offered the following explanation for PKV&S' claiming a bad debt expense with respect to these transfers:

> At December 31, 1990, the Company had made $1,096,250 of noninterest-bearing advances to PK Ventures I Limited Partnership (LTD) in which it has a 1% general partnership interest and a 29% limited partnership interest.  The Company made additional advances to LTD in 1991 of $419,996, principally to fund operating losses.  Management of the Company believes that recovery of its advances to and investment in LTD is unlikely and, accordingly, has forgiven advances amounting to $1,312,151 in 1991 and charged bad debts expense.  The Company also recorded losses under the equity method of $129,095 in 1991 and $75,000 in 1990.

PKV&S claimed a $1,916,246 bad debt deduction on its consolidated income tax return for 1991 for the cash transfers that PK Ventures, TBPC, and TPTC had made to PKVI LP and for the cash transfer that PK Ventures had made to Rose in connection

with the Zephyr purchase.  With respect to this bad debt

deduction, PKV&S reported that $1,516,246 was attributable to the

$1,516,246 promissory note's being uncollectible.  On its

consolidated income tax return for 1991, PKV&S reported that

PK Ventures had imputed interest payments from PKVI LP under

section 7872 totaling $100,661.

g.  <u>1992</u>

The reviewed financial statements of PKVI LP for the year

ended December 31, 1992, indicate that PK Ventures, as PKVI LP's

sole limited partner, continued to transfer funds to PKVI LP

during 1992.  Note 4 to these financial statements stated the

following:

> At December 31, 1991, the general partner,
> P K Ventures, Inc. forgave advances totaling
> $1,516,246.  At December 31, 1992, the Partnership owed
> the limited partner $335,448 in the form of demand
> notes at 9% interest.  These notes cannot be repaid if
> such payment causes defaults with regard to other debt
> agreements.  Interest of $10,645 was incurred but not
> paid during 1992 related to these notes.

On the Balance Sheets included in these financial statements,

$335,448 for "Notes payable to limited partner" was listed as a

current liability.

On the Consolidated Statements of Cash Flows included in

PKV&S's audited consolidated financial statements for the year

ended December 31, 1992, there was no amount listed for "Advances

to limited partnership" under the "Investing activities" section.

Note 3, "Due From Limited Partnership", to these financial

statements does not mention that any transfers had been made from PK Ventures to PKVI LP during 1992.

### h. 1993

PKVI LP's reviewed financial statements for the year ended December 31, 1993, indicate that PKVI LP received transfers from PK Ventures totaling $242,073 during 1993. Note 4 to PKVI LP's reviewed financial statements for the year ended December 31, 1993, stated: "At December 31, 1993, the Partnership owed one limited partner $577,521 in the form of demand notes at interest rates ranging from 8% to 9%. Interest of $31,201 and $10,645 was incurred but not paid during 1993 and 1992, respectively." On the Balance Sheets included in these financial statements, $577,521 for "Notes payable to limited partner" was listed as a current liability.

On the Consolidating Balance Sheet included in PKV&S's audited consolidated financial statements for the year ended December 31, 1993, there were no amounts listed as "Due from affiliated partnership" or as "Investments in limited partnerships" with respect to PK Ventures.

### 2. IRS Determinations

The IRS determined that PKV&S should not have imputed $67,772 of interest income from PKVI LP on its consolidated income tax return for 1990 or $100,661 of interest income from PKVI LP on its consolidated income tax return for 1991 because

the cash transfers that PK Ventures had made to PKVI LP were contributions to capital instead of loans. Accordingly, the IRS decreased PKV&S's interest income by $67,772 for 1990 and by $100,661 for 1991.

The IRS also determined that PKV&S was not allowed to claim a bad debt deduction of $1,516,246 on its consolidated income tax return for 1991 for cash transfers that PK Ventures and/or its subsidiaries had made to PKVI LP because these transfers were contributions to capital instead of loans. Alternatively, the IRS determined that, if these transfers were not contributions to capital, they were made for the benefit of the partners of PKVI LP and, thus, were distributions to the partners. As a further alternative, the IRS determined that, if these transfers were bona fide loans, the bad debt deduction should not be allowed because PKV&S had not established that the debt had become worthless during 1991. Accordingly, the IRS increased PKV&S's taxable income by $1,516,246 for 1991.

The IRS determined that PKVI LP should not have imputed $100,661 of interest expense to PK Ventures on its Form 1065 for 1991 because it had not been established that the interest expense was attributable to a bona fide debt. Rather, the IRS determined that the funds that had been transferred from PK Ventures and/or its subsidiaries to PKVI LP were capital

contributions.  Accordingly, the IRS increased PKVI LP's ordinary income by $100,661 for 1991.

The IRS determined that the cash transfers that had been made by PK Ventures and/or its subsidiaries to PKVI LP were made on behalf of the Roses and that the transfers constituted constructive dividends to them.  After making certain concessions, the IRS determined that the Roses should have reported a constructive dividend of $411,338 on their joint income tax return for 1990 and a constructive dividend of $293,997 on their joint income tax return for 1991.  Accordingly, the IRS increased the Roses' taxable income by $411,338 for 1990 and by $293,997 for 1991.

The IRS notified the Roses that, with respect to 1991, PKVI LP was subject to partnership-level proceedings pursuant to the partnership audit and litigation procedures of sections 6221 through 6233.  Consequently, the IRS removed the amount that the Roses had reported as their distributive share of PKVI LP's cancellation of indebtedness income from their income for that year.  The IRS made these adjustments pursuant to Munro v. Commissioner, 92 T.C. 71 (1989).

Other Circumstances Surrounding PK Ventures' Operations and
Financial Arrangements

    A.  Going Concern Notes in the Business's Financial
        Statements

        1.  PK Ventures, SLPC, TBPC, and TPTC

Note 10 to PK Ventures' audited financial statements for the year ended December 31, 1989, set forth the going concern position of the corporation.  Note 10 stated, in pertinent part, the following with respect to the corporation's financial status: "Management's plans include several steps which may mitigate the current adverse financial condition.  * * * The Company's management extended payment terms related to certain accrued payables such as officer's salaries, indefinitely, subject to cash availability."  The notes to SLPC, TBPC, and TPTC's audited financial statements for the year ended December 31, 1989, also include "going concern" notes that state that each corporation's management had "extended payment terms related to certain accrued payables such as officer's salary, indefinitely, subject to cash availability."  No corporate resolutions and/or other agreements by PK Ventures, SLPC, TBPC, or TPTC set forth the terms of these extended payment arrangements.

        2.  PKVI LP

Note 8 to PKVI LP's audited financial statements for the year ended December 31, 1989, set forth the going concern position of the partnership.  Note 8 stated the following with

respect to the partnership's financial status: "Management's
plans include several steps which may mitigate the current
adverse financial condition. These steps include renegotiation
and reduction of short term debt * * * and reduction of certain
operating costs."

Note E to PKVI LP's audited financial statements for the
year ended December 31, 1990, set forth the going concern
position of the partnership. Note E stated, in pertinent part,
the following with respect to the partnership's financial status:

> The Partnership's financial statements have been
> presented on a going concern basis which contemplates
> the realization of assets and the satisfaction of
> liabilities in the normal course of business. At
> December 31, 1990, partners' capital is in a deficit
> position of $667,182. Management plans to mitigate the
> current adverse financial position by restoring one of
> its plants to operating condition during 1991 and
> completing construction projects on two hydroelectric
> plants which are not yet operational to generate
> revenues. In addition, P.K. Ventures, Inc., the
> general and a limited partner, will continue to advance
> cash to the Partnership as needed. * * *

Note 6 to PKVI LP's reviewed financial statements for the
year ended December 31, 1992, set forth the going concern
position of the partnership. Note 6 stated, in pertinent part,
the following with respect to the partnership's financial status:

> The Partnership's financial statements have been
> presented on a going-concern basis which contemplates
> the realization of assets and the satisfaction of
> liabilities in the normal course of business. Cash
> flow deficits and capital needs were supplied and
> funded in 1991 by P K Ventures, Inc. In 1992, cash
> flow deficits and capital needs were funded by a loan
> from the limited partner. Management is exploring the

possibility of renegotiating higher rates on the sales of power and intends to maintain tight expense control at all three of its operational plants. The Partnership may be able to obtain additional funding from the limited partner. Management is also exploring a possible reorganization or merger. The outcome of these matters cannot be predicted at this time.

Note 6 to PKVI LP's reviewed financial statements for the year ended December 31, 1993, set forth the going concern position of the partnership. Note 6 stated, in pertinent part, the following with respect to the partnership's financial status:

> The Partnership's financial statements have been presented on a going-concern basis which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. Cash flow deficits and capital needs were funded in 1993 and 1992 by loans from the limited partner. Management is also exploring a possible reorganization or merger. The outcome of these matters cannot be predicted at this time.

B.  Litigation Involving SLPC, TBPC, and TPTC

A majority of PK Ventures' income was generated by the operations of its pipeline subsidiaries (i.e., SLPC, TBPC, TPC, and TPTC). PK Ventures' largest investments were in TBPC and TPTC.

As of December 31, 1991, SLPC, TBPC, and TPTC were all litigating separate matters. The matters being litigated affected the corporations' revenue streams. In particular, TBPC did not receive any of the $483,000 of lease payments that it was owed by Royster between April 1991 and June 1992. In addition,

SLPC's pipeline was taken out of service sometime prior to January 1, 1992, for environmental reasons.

There were no direct references made to this litigation in PKV&S's audited consolidated financial statements for the year ended December 31, 1991.  Note 5 of these financial statements, however, stated, in pertinent part, that:  "The Company has not repaid $1,300,000 of subordinated notes payable to the former shareholders of its subsidiaries pending the resolution of various claims against the former shareholders."

C.  Transfers From Rose to PK Ventures

As of the beginning of October 1992, PK Ventures owed $1.3 million to the TPTC sellers.  This amount was to have been paid by January 1, 1992.  This debt was settled in October 1992 when PK Ventures agreed to pay the TPTC sellers $590,000.  Rose transferred the $590,000 to PK Ventures in October 1992 so that it could pay the TPTC sellers.  PK Ventures was relieved of the remaining balance of this $1.3 million debt.

In sum, Rose made cash transfers to PK Ventures totaling $990,000 during 1992.  Of this $990,000, Rose transferred $940,000 during the last quarter of 1992.  PK Ventures executed documents that were identical to the PKVI LP promissory notes described above in favor of Rose with respect to these transfers. These documents were signed by Rose alone; they were neither attested to by a witness nor notarized.

During 1993, Rose made cash transfers to PK Ventures and its subsidiaries totaling $2,863,500. Note 3 to PKV&S's audited consolidated financial statements for the year ended December 31, 1993, stated the following with respect to these transfers:

> Notes payable to shareholder represent cash advances contributed to the Company by the major shareholder for operations. The notes bear interest at 12% and are due on demand. The shareholder advanced $2,863,500 and $990,000 to the Company during 1993 and 1992, respectively.

> Interest expense on notes payable to shareholder was $292,350 and $19,313 during 1993 and 1992, respectively.

Rose's Wages for 1986 Through 1993

The following table breaks down the percentage of time that Rose devoted to his duties for Printon Kane and/or the Printon Kane Group, PK Ventures and its subsidiaries, PKVI LP, and Zephyr during 1986 through 1993:

| Year | Printon Kane/ Printon Kane Group | PK Ventures and Subsidiaries | PKVI LP | Zephyr |
|------|------|------|------|------|
| 1986 | 40% | 50% | 10% | -- |
| 1987 | 20 | 40 | 10 | 30% |
| 1988 | 15 | 40 | 15 | 30 |
| 1989 | 15 | 50 | 15 | 20 |
| 1990 | -- | 78 | 15 | 7 |
| 1991 | -- | 85 | 15 | -- |
| 1992 | -- | 85 | 15 | -- |
| 1993 | -- | 85 | 15 | -- |

During these years, Rose routinely worked long hours and rarely took vacations.

PK Ventures reported the following amounts from its operations on its income tax return for 1986, and PKV&S reported

the following amounts from its operations on its consolidated

income tax returns for 1987 through 1993:

| Year | Gross Receipts or Sales | Gross Profit | Total Income (Loss) | Net Income (Loss) |
|------|-------------------------|--------------|---------------------|-------------------|
| 1986 | -- | -- | ($1,307) | ($9,318) |
| 1987 | $3,054,478 | $3,054,478 | 3,569,218 | (228,055) |
| 1988 | 4,026,675 | 2,805,981 | 3,217,948 | 579,061 |
| 1989 | 4,457,954 | 3,368,325 | 3,700,349 | (43,069) |
| 1990 | 5,300,792 | 4,620,576 | 4,815,805 | 650,781 |
| 1991 | 5,002,606 | 4,490,177 | 5,783,636 | 1,037,967 |
| 1992 | 4,777,238 | 4,193,245 | 4,775,526 | 802,979 |
| 1993 | 4,638,025 | 3,884,120 | 4,591,313 | 230,435 |

PKVI LP reported the following amounts from its operations

on its Forms 1065 for 1986 through 1993:

| Year | Gross Receipts or Sales | Gross Profit | Total Income (Loss) | Ordinary Income (Loss) From Business Activities |
|------|-------------------------|--------------|---------------------|------------------------------------------------|
| 1986 | $11,093 | $11,093 | $12,488 | ($132,332) |
| 1987 | 158,501 | 61,358 | 61,358 | (203,653) |
| 1988 | 151,381 | 28,755 | 28,755 | (346,069) |
| 1989 | 227,616 | 35,120 | 35,120 | (495,274) |
| 1990 | 144,153 | (260,619) | (260,619) | (603,756) |
| 1991 | 61,071 | (183,635) | (181,635) | (604,235) |
| 1992 | 100,250 | 100,250 | 100,250 | (839,738) |
| 1993 | 101,703 | 101,703 | 101,703 | (627,306) |

Zephyr reported the following amounts from its operations on

its Forms 1120S for 1987 through 1989:

| Year | Gross Receipts or Sales | Gross Profit | Total Income (Loss) | Ordinary Income (Loss) From Business Activities |
|------|-------------------------|--------------|---------------------|------------------------------------------------|
| 1987 | $1,623,593 | ($211,807) | ($85,237) | ($964,830) |
| 1988 | 2,022,492 | (569,839) | (563,666) | (1,993,131) |
| 1989 | 516,969 | (1,117,281) | (1,117,281) | (1,628,388) |

In addition to the wages discussed below, PK Ventures provided health insurance to Rose and his family during the years in issue. Sometime in 1991, PK Ventures purchased a Honda Civic and provided that car to Rose. PK Ventures replaced the Honda Civic with a Mercedes Benz in 1993 and provided the Mercedes Benz to Rose throughout that year and the remaining years in issue. Rose determined that PK Ventures would not provide him with any retirement benefits.

A. Wages Received From Printon Kane and the Printon Kane Group

Rose's salaries from Printon Kane during 1986, 1987, and 1988 were $65,000, $67,500, and $65,000, respectively. In 1989, Rose received salaries from Printon Kane and the Printon Kane Group totaling $34,423 and $12,115, respectively. In 1990, Rose received a salary from the Printon Kane Group totaling $6,923. Rose did not receive any compensation from either Printon Kane or the Printon Kane Group after 1990.

B. Wages Recorded on PK Ventures' Books and Records

PK Ventures' general ledger for 1990 indicated that, during 1990, PK Ventures paid Rose compensation totaling $350,000. PK Ventures' general ledger for 1990 also indicated that, of this $350,000, PK Ventures had accrued $65,000 prior to 1990 and that SLPC, TBPC, and TPTC had accrued the balance prior to and during 1990 in the following proportions:

| Year | Total Compensation Accrued | Portion Attributable To: SLPC | TBPC | TPTC |
|------|---------|---------|---------|---------|
| 1987 | $75,000 | $15,000 | $30,000 | $30,000 |
| 1988 | 75,000 | 15,000 | 30,000 | 30,000 |
| 1989 | 75,000 | 15,000 | 30,000 | 30,000 |
| 1990 | 60,000 | -- | 30,000 | 30,000 |
| Total | 285,000 | 45,000 | 120,000 | 120,000 |

As of December 31, 1991, PK Ventures' books indicated that, during 1991, PK Ventures had accrued $90,000 of "Salary" and an additional $37,469 of "Compensation & Benefits" with respect to Rose, that TBPC had accrued $30,000 of "Compensation & Benefits" with respect to Rose, and that TPTC had accrued $30,000 of "Mgt Salaries" with respect to Rose.

During March 1992, Rose made journal entries to PK Ventures' general ledger to reflect "deferred compensation" payable to him for 1986 through 1991 in the following amounts:

| Year | Amount |
|------|--------|
| 1986 | $500,000 |
| 1987 | 600,000 |
| 1988 | 720,000 |
| 1989 | 840,000 |
| 1990 | 900,000 |
| 1991 | 900,000 |

According to this "Deferred Compensation" account, PK Ventures owed Rose $4,460,000 as of March 30, 1992. Prior to Rose's making these journal entries, there had never been a written agreement between Rose and PK Ventures as to deferred compensation, and Rose had never discussed deferred compensation

with anyone who had an equity interest or financial interest in PK Ventures.

PK Ventures' general ledger for 1992 indicated that, during 1992, PK Ventures paid Rose $500,000 for 1986 and $246,948 for 1987. As of December 31, 1992, the "Deferred Compensation" account included in PK Ventures' general ledger showed a current balance of $3,713,052. At the advice of the auditors of PKV&S's consolidated financial statements, this balance was "reversed" off of PK Ventures' general ledger. Consequently, there was no liability for deferred compensation reported on PKV&S's audited consolidated financial statements for the year ended December 31, 1992, or on PKV&S's audited consolidated financial statements for the year ended December 31, 1993. Moreover, there was no liability for deferred compensation reported on the Schedules L attached to PKV&S's consolidated income tax returns for 1992 and 1993.

PK Ventures' general ledger for 1992 also indicated that, during 1992, PK Ventures paid Rose $900,000 for his services to it and its subsidiaries. Of this $900,000, $32,500 was attributable to "MGT SAL TPTC" and $32,500 was attributable to "MGT SAL TBPC".

PK Ventures' general ledger for 1993 indicated that, during 1993, PK Ventures paid Rose compensation totaling $2,031,993. The general ledger did not clearly indicate what portion of this

$2,031,993 was attributable to current compensation and what part (if any) was attributable to deferred compensation.

Rose, as sole director of PK Ventures, determined the amounts of compensation that PK Ventures paid to him during the years in issue. With respect to the $4,460,000 of "deferred compensation" that was recorded in PK Ventures' general ledger for 1992, Rose first determined this amount sometime between the beginning of 1992 and March 30, 1992. Included in the determination of the $4,460,000 was the amount of compensation that Rose believed that he should have received from Zephyr during a 16-month period in 1987 and 1988. There had never been an amount accrued as a salary for Rose on Zephyr's books and records, and PK Ventures had never been a shareholder of Zephyr. Furthermore, the total compensation that Rose determined that PK Ventures should pay him for 1992 and 1993 related to his providing services over an "8.3-year" period that included a portion of 1985 and the entirety of 1986 through 1993.

C. Wages Reported on Income Tax Returns

PK Ventures deducted the following amounts as compensation paid to officers and salaries and wages paid on its income tax return for 1986, and PKV&S deducted the following amounts as compensation paid to officers and salaries and wages paid on its consolidated income tax returns for 1987 through 1993:

| Year | Compensation Paid to Officers | Salaries and Wages Paid |
|------|------------------------------|-------------------------|
| 1986 | -- | -- |
| 1987 | -- | $173,844 |
| 1988 | -- | 192,211 |
| 1989 | $170,000 | -- |
| 1990 | 80,068 | 276,190 |
| 1991 | 103,000 | 396,247 |
| 1992 | 1,646,948 | 306,718 |
| 1993 | 2,031,993 | 352,974 |

All of the amounts that PKV&S reported as compensation paid to officers on these returns were attributable to Rose.

On the Roses' joint income tax returns for 1990 through 1995, Rose reported that he received the following amounts of compensation:

| Year | Wages and Salaries | Gross Income Reported on Schedule C | Miscellaneous Income from Form 1099 |
|------|--------------------|-------------------------------------|-------------------------------------|
| 1990 | $6,923 | $17,000 | -- |
| 1991 | -- | -- | $103,000 |
| 1992 | -- | -- | 1,646,948 |
| 1993 | -- | -- | 2,031,993 |
| 1994 | 606,250 | -- | -- |
| 1995 | 250,000 | -- | -- |

Rose did not report any compensation from PK Ventures or its subsidiaries in 1987 or 1988.

On its consolidated income tax return for 1990, PKV&S claimed a $50,068 deduction for officer compensation paid to Rose and a $30,000 deduction for a "salary transfer to Tampa Bay Pipeline Co." from PK Ventures. PKV&S reported that $17,000 of the $50,068 was paid by TPTC and that the balance was paid by PK Ventures. Neither the $30,000 attributable to TBPC nor the

$50,068 attributable to PK Ventures and TPTC appears on the Roses' joint income tax return for 1990 as wages received. Rose did, however, report $33,068 of imputed interest from PK Ventures on that return as well as $17,000 of gross income from his involvement in an "investment company" on a Schedule C, Profit or Loss From Business, that was attached to the return.

On its consolidated income tax return for 1991, PKV&S claimed a $103,000 deduction for officer compensation paid to Rose. PKV&S reported that $30,000 of this amount was paid by TBPC, that $30,000 was paid by TPTC, and that the balance was paid by PK Ventures. In addition, PKV&S claimed a $37,469 deduction for other salaries and wages paid to Rose. This latter deduction was attributable to the "reclassification" of an account showing that Rose owed PK Ventures $437,469 as of December 31, 1991. As discussed above, this "reclassification" resulted in PKV&S's claiming a $400,000 bad debt deduction as well as the $37,469 deduction for other salaries and wages paid to Rose. The Roses reported the $103,000 of officer compensation on their joint income tax return for 1991, but they failed to report the $37,469 of other salaries and wages.

On its consolidated income tax return for 1992, PKV&S claimed a $1,646,948 deduction for officer compensation paid to Rose. PKV&S reported that $32,500 of this amount was paid by TBPC, that $32,500 was paid by TPTC, and that the balance was

paid by PK Ventures. The Roses reported the $1,646,948 of officer compensation on their joint income tax return for 1992.

On its consolidated income tax return for 1993, PKV&S claimed a $2,031,993 deduction for officer compensation paid to Rose. PKV&S reported that $32,500 of this amount was paid by TBPC, that $32,500 was paid by TPTC, and that the balance was paid by PK Ventures. The Roses reported the $2,031,993 of officer compensation on their joint income tax return for 1993. In addition to this amount, the Roses reported interest from PK Ventures of $292,350.

Rose received the amounts of wages and salaries that he reported on the Roses' joint income tax returns for 1994 and 1995 from TPC. TPC issued Forms W-2, Wage and Tax Statement, to Rose with respect to these amounts.

D. IRS Determinations

With respect to 1990, the IRS determined that Rose should have reported a total of $350,000 of compensation from PK Ventures and its subsidiaries. The IRS determined that this amount included $285,000 of compensation that had been accrued by SLPC, TBPC, and TPTC during 1987, 1988, 1989, and 1990 and paid to Rose in 1990 and included $65,000 of compensation that had been accrued by PK Ventures prior to 1990 and paid to Rose in 1990. After taking into account the $17,000 of gross income that Rose had reported on a Schedule C that was attached to the Roses'

joint income tax return for 1990 and shifting $13,000 of the compensation that Rose reported in 1991 to 1990, the IRS increased the Roses' taxable income for 1990 by $320,000.

With respect to 1991, the IRS determined that Rose should have reported an additional $97,469 of compensation from PK Ventures and its subsidiaries. The IRS determined that this amount included $60,000 of compensation that had been accrued by TBPC and TPTC during 1991 and included $37,469 of compensation that had been accrued by PK Ventures during that year. Accordingly, the IRS increased the Roses' taxable income for 1991 by $97,469.

The Roses conceded these adjustments for 1990 and 1991. Taking into account these concessions, Rose received the following amounts of compensation for his services to PK Ventures and its subsidiaries during 1986 through 1991:

| Entity | 1986-89 | 1990 | 1991 |
|--------|---------|------|------|
| PK Ventures | $170,000 | $98,068 | $67,469 |
| SLPC | -- | 45,000 | -- |
| TBPC | -- | 120,000 | 60,000 |
| TPTC | -- | 120,000 | 60,000 |
| Total | 170,000 | 383,068 | 187,469 |

In sum, Rose received $740,537 for his services to PK Ventures and its subsidiaries during these years.

With respect to 1992, the IRS determined that the deduction that PKV&S claimed for compensation paid to Rose should be reduced by $1,208,893. The IRS determined this reduction by subtracting (1) reasonable salary for 1992 totaling $143,317 and (2) deferred compensation totaling $294,738 from the $1,646,948 that PKV&S deducted in that year. The IRS determined the reasonable salary for 1992 by multiplying PKV&S's gross receipts for that year by 3 percent. The IRS determined deferred compensation as follows:

| Year | Salary Deducted on Return | Reasonable Salary | Difference | Deferred Compensation |
|------|---------------------------|-------------------|------------|----------------------|
| 1987 | -- | $91,634 | ($91,634) | $91,634 |
| 1988 | -- | 120,800 | (120,800) | 120,800 |
| 1989 | $170,000 | 133,739 | 36,261 | (36,261) |
| 1990 | 50,068 | 159,024 | (108,956) | 108,956 |
| 1991 | 140,469 | 150,078 | (9,609) | 9,609 |
| Total | 360,537 | 655,275 | (294,738) | 294,738 |

As it did in 1992, the IRS determined reasonable salary for 1987 through 1991 by multiplying PKV&S's gross receipts for each of those years by 3 percent. Accordingly, the IRS increased PKV&S's taxable income by $1,208,893 for 1992.

With respect to 1993, the IRS determined that the deduction that PKV&S claimed for compensation paid to Rose should be reduced by $1,892,852.  The IRS determined this reduction by subtracting reasonable salary for 1993 totaling $139,141 from the officer compensation that PKV&S deducted in that year.  As it did in 1992, the IRS determined reasonable salary for 1993 by multiplying PKV&S's gross receipts for that year by 3 percent. Accordingly, the IRS increased PKV&S's taxable income by $1,892,852 for 1993.

PK Ventures' Share of PKVI LP's Items of Income and Loss

    A.  As Reported on PK Ventures' Schedules K-1

The following items were listed on PK Ventures' Schedules K-1 that were attached to PKVI LP's Forms 1065 for 1986 through 1993:

| Year | Item | Amount | |
| | | General Interest | Limited Interest |
| --- | --- | --- | --- |
| 1986 | Capital contributed during year | $500 | -- |
| | Net long-term capital gain | 29 | -- |
| | Withdrawals and distributions | -- | -- |
| | Ordinary loss from business activities | (1,323) | -- |
| | Net short-term capital loss | (13) | -- |
| 1987 | Capital contributed during year | -- | -- |
| | Interest income | 69 | -- |
| | Withdrawals and distributions | -- | -- |
| | Ordinary loss from business activities | (2,036) | -- |
| 1988 | Capital contributed during year | 3,540 | -- |
| | Withdrawals and distributions | -- | -- |
| | Ordinary loss from business activities | (18,515) | -- |
| 1989 | Capital contributed during year | -- | -- |
| | Withdrawals and distributions | -- | -- |
| | Ordinary loss from business activities | (26,497) | -- |
| 1990 | Capital contributed during year | -- | ($95,640) |
| | Net gain under section 1231 | 708 | 2,105 |
| | Withdrawals and distributions | -- | -- |
| | Ordinary loss from business activities | (32,301) | (96,097) |
| 1991 | Capital contributed during year | -- | -- |
| | Cancellation of indebtedness income | 81,119 | 373,755 |
| | Withdrawals and distributions | -- | -- |
| | Ordinary loss from business activities | (32,327) | (148,944) |
| 1992 | Capital contributed during year | -- | -- |
| | Withdrawals and distributions | -- | -- |
| | Ordinary loss from business activities | (44,925) | (206,996) |
| 1993 | Capital contributed during year | -- | -- |
| | Withdrawals and distributions | -- | -- |
| | Ordinary loss from business activities | (33,561) | (154,631) |
| | Net loss under section 1231 | (4,405) | (20,296) |

B. As Reported on the Income Tax Returns for PK Ventures and PKV&S

PK Ventures reported the following amount with respect to its interest in PKVI LP on its income tax return for 1986, and

PKV&S reported the following amounts with respect to PK Ventures'
and/or its subsidiaries' interests in PKVI LP on its consolidated
income tax returns for 1987 through 1993:

| Year | Income (Loss) from PKVI LP | Bad Debts | Cancellation of Indebtedness Income |
|------|------|------|------|
| 1986 | ($1,323) | -- | -- |
| 1987 | (2,036) | -- | -- |
| 1988 | (18,515) | -- | -- |
| 1989 | (26,497) | -- | -- |
| 1990 | (124,687) | -- | -- |
| 1991 | (181,271) | $1,516,246 | $454,874 |
| 1992 | (251,921) | -- | -- |
| 1993 | (212,893) | -- | -- |

C.  IRS Determinations

The IRS determined that PKV&S could deduct PK Ventures'
distributive share of PKVI LP's losses for 1990, 1991, 1992, and
1993 to the extent of PK Ventures' basis in its PKVI LP interest.
Before taking into account any of PKVI LP's losses, the IRS
determined that PK Ventures' basis in its PKVI LP interest was
$114,936 as of December 31, 1990.  The IRS determined this amount
by subtracting the amount of PKVI LP's losses that PKV&S deducted
in 1986, 1987, 1988, and 1989 from the cash advances that it
determined that PK Ventures had made to PKVI LP in 1990 and prior
years and the capital contribution that it determined that
PK Ventures had made to PKVI LP in 1988.  The IRS allowed as a
deduction against this basis $114,936 of PK Ventures'
distributive share of PKVI LP's losses for 1990.  Accordingly,
the IRS increased PKV&S's taxable income by $9,751 for 1990.

Before taking into account any of PKVI LP's losses, the IRS determined that PK Ventures' basis in its PKVI LP interest was zero as of December 31, 1991.  With respect to 1991, the IRS notified PKV&S that PKVI LP was subject to partnership-level proceedings pursuant to the partnership audit and litigation procedures of sections 6221 through 6233.  Consequently, the IRS removed the amounts that PKV&S had reported as PK Ventures' distributive shares of PKVI LP's loss and cancellation of indebtedness income from PKV&S's taxable income for that year. The IRS made these adjustments pursuant to Munro v. Commissioner, 92 T.C. 71 (1989).  PKV&S's taxable income for 1991 was not affected as a result of these adjustments.

Before taking into account any of PKVI LP's losses, the IRS determined that PK Ventures' basis in its PKVI LP interest was zero as of December 31, 1992, and zero as of December 31, 1993. Consequently, the IRS did not allow PKV&S to deduct any of PKVI LP's losses during those years.  The IRS increased PKV&S's taxable income by $251,921 for 1992 and by $212,893 for 1993.

The Roses' Share of PKVI LP's Items of Income and Loss

A.  As Reported on Rose's Schedules K-1

The following items were listed on Rose's Schedules K-1 that were attached to PKVI LP's Forms 1065 for 1986 through 1993:

| Year | Item | Amount |
|------|------|--------|
| 1986 | Capital contributed during year | -- |
|      | Net long-term capital gain | $865 |
|      | Withdrawals and distributions | -- |
|      | Ordinary loss from business activities | (39,700) |
|      | Net short-term capital loss | (388) |
| 1987 | Capital contributed during year | -- |
|      | Interest income | 2,077 |
|      | Withdrawals and distributions | -- |
|      | Ordinary loss from business activities | (61,096) |
| 1988 | Capital contributed during year | -- |
|      | Withdrawals and distributions | -- |
|      | Ordinary loss from business activities | (103,820) |
| 1989 | Capital contributed during year | (94,525) |
|      | Withdrawals and distributions | -- |
|      | Ordinary loss from business activities | (346,692) |
| 1990 | Capital contributed during year | -- |
|      | Net gain under section 1231 | 9,256 |
|      | Withdrawals and distributions | -- |
|      | Ordinary loss from business activities | (422,629) |
| 1991 | Capital contributed during year | -- |
|      | Cancellation of indebtedness income | 1,061,372 |
|      | Withdrawals and distributions | -- |
|      | Ordinary loss from business activities | (422,964) |
| 1992 | Capital contributed during year | -- |
|      | Withdrawals and distributions | -- |
|      | Ordinary loss from business activities | (587,817) |
| 1993 | Capital contributed during year | -- |
|      | Withdrawals and distributions | -- |
|      | Ordinary loss from business activities | (439,114) |
|      | Net loss under section 1231 | (57,635) |

B.  As Reported on the Roses' Income Tax Returns

On their joint income tax returns for 1990 through 1995, the Roses reported the following amounts of income and loss with respect to their interest in PKVI LP:

|      | Income (Loss) from PKVI LP | Cancellation of Indebtedness Income |
| ---- | -------------------------- | ----------------------------------- |
| 1990 | --                         | --                                  |
| 1991 | ($654,236)                 | $1,061,372                          |
| 1992 | (1,008,745)                | --                                  |
| 1993 | (689,766)                  | --                                  |
| 1994 | (373,590)                  | --                                  |
| 1995 | (679,795)                  | --                                  |

The Roses attached the following statement, in pertinent part, to their joint income tax return for 1990:

> The above mentioned taxpayers have elected to carryforward the net operating lossess [sic] of the following companies for the tax period ending 12/31/90:
>
> * * * * * * *
>
> 2. PK Ventures I Limited Partnership, (1990) the aggregate amount of $422,629, which appears on the taxpayer's Schedule K-1 (Form 1065) line 1, * * *
>
> * * * * * * *
>
> In addition, unused outstanding amounts have been carried forward: * * * PK Ventures I Limited Partnership (1988) of $103,820 * * * and PK Ventures I Limited Partnership (1989) of $318,768.

This statement was signed by the Roses and dated October 12, 1991. In sum, the Roses carried forward losses from PKVI LP totaling $845,217.

The Roses attached the following statement, in pertinent part, to their joint income tax return for 1991:

> The above mentioned taxpayers have elected to carryforward the net operating lossess [sic] of the following companies for the tax period ending 12/31/91:
>
> 1. The amount of $318,768 of unapplied net operating loss from PK Ventures I LP (1989) * * * was carried forward to 1991. Of this amount, $127,452

was applied in 1991 (Schedule E2, line 31H) and the balance of $191,316 carried forward.

2.   The amount of $422,629 unapplied net operating loss from PK Ventures LP (1990) * * * has been carried forward.

This statement was signed by the Roses and dated October 14, 1992.  In sum, the Roses carried forward losses from PKVI LP totaling $613,945.

The Roses attached the following statement to their joint income tax return for 1992:

The above mentioned taxpayers have elected to apply * * * the net operating losses of the following company for the tax period ending 12/31/92:

1.   The amount of $394,800 of net operating losses from PK Ventures I Limited Partnership (1992) * * * have been applied.  The taxpayer has elected to carryforward the balance of $193,017 of unapplied net operating losses.

2.   The amount of $191,316 of net operating losses from PK Ventures I Limited Partnership (1989) * * * have been applied.

3.   The amount of $422,629 of net operating losses from PK Ventures I Limited Partnership (1990) * * * have been applied.

In sum, the Roses carried forward losses from PKVI LP totaling $193,017.

The Roses attached the following statement, in pertinent part, to their joint income tax return for 1993:  "The above mentioned taxpayers have elected to apply * * * the net operating loss carryforward for the tax period ending 12/31/93 for the

amount of $193,017 from PK Ventures I Limited Partnership (1992)".

C. <u>IRS Determinations</u>

The IRS determined that the Roses could deduct their distributive share of PKVI LP's losses for 1990, 1991, 1992, 1993, 1994, and 1995 to the extent of the basis in their PKVI LP interest. Before taking into account any of PKVI LP's losses, the IRS determined that the Roses' basis in their PKVI LP interest was $667,056 as of December 31, 1990. The IRS determined this amount by subtracting the amount of PKVI LP's losses that the Roses deducted in 1988 and 1989 from the amount of constructive dividends that it determined that the Roses recognized as a result of the transfers from PK Ventures, TBPC, and TPTC to PKVI LP prior to 1991. The IRS included a note stating that this basis computation "will need to be adjusted if the level of constructive dividends shown in Adjustment H are [sic] changed." The IRS allowed as a deduction against this basis (1) a $103,820 loss carryover from PKVI LP's 1988 partnership year; (2) a $318,788 loss carryover from PKVI LP's 1989 partnership year; and (3) $244,468 of the Roses' distributive share of PKVI LP's losses for 1990. Accordingly, the IRS decreased the Roses' taxable income by $667,056 for 1990.

Before taking into account any of PKVI LP's losses, the IRS determined that the Roses' basis in their PKVI LP interest was

$293,997 as of December 31, 1991. The IRS determined that the Roses recognized this amount of constructive dividends as a result of the transfers from PK Ventures, TBPC, and TPTC to PKVI LP during 1991. The IRS included a note stating that this basis computation "will need to be adjusted if the level of constructive dividends shown in Adjustment H are [sic] changed." As discussed above, the IRS notified the Roses that PKVI LP was subject to partnership-level proceedings pursuant to the partnership audit and litigation procedures of sections 6221 through 6233 with respect to 1991. Consequently, the IRS removed the amounts that had been reported as the Roses' distributive share of PKVI LP's losses and cancellation of indebtedness income from the Roses' taxable income for 1991. After making these adjustments, the IRS determined that the Roses could deduct the balance of their distributive share of PKVI LP's losses for 1990, $178,161. Because the balance of the Roses' distributive share of PKVI LP's losses for 1990 was $53,111 less than the amount of PKVI LP's losses that the Roses claimed on their joint income tax return for 1991 (after removal of the Roses' distributive share of PKVI LP's losses for 1991 from that amount), the IRS increased the Roses' taxable income by $53,111 for 1991.

Before taking into account any of PKVI LP's losses, the IRS determined that the Roses' basis in their PKVI LP interest was $335,448 as of December 31, 1992. The IRS determined that this

amount had been advanced to PKVI LP on behalf of the Roses during 1992. The IRS allowed as a deduction against this basis $98,782 of the Roses' distributive share of PKVI LP's losses for 1992. Accordingly, the IRS increased the Roses' taxable income by $909,963 for 1992.

Before taking into account any of PKVI LP's losses, the IRS determined that the Roses' basis in their PKVI LP interest was $242,073 as of December 31, 1993. The IRS determined that this amount had been advanced to PKVI LP on behalf of the Roses during 1993. The IRS allowed as a deduction against this basis $242,073 of the Roses' balance of their distributive share of PKVI LP's losses for 1992. Accordingly, the IRS increased the Roses' taxable income by $447,693 for 1993.

Before taking into account any of PKVI LP's losses, the IRS determined that the Roses' basis in their PKVI LP interest was zero as of December 31, 1994, and zero as of December 31, 1995. Consequently, the IRS did not allow the Roses to deduct any of PKVI LP's losses during those years. The IRS increased the Roses' taxable income by $373,590 for 1994 and $679,795 for 1995.

The Roses' Share of Zephyr's Items of Income and Loss

A. As Reported on Rose's Schedules K-1

The following items were listed as Rose's pro rata share of Zephyr's items of income, loss, and deduction on Rose's Schedules K-1, Shareholder's Share of Income, Credits,

Deductions, etc., that were attached to Zephyr's Forms 1120S for 1987 through 1989:

| Year | Item | Amount |
|------|------|--------|
| 1987 | Ordinary loss from business activities | ($179,025) |
|      | Interest income | 511 |
|      | Net long-term capital gain | 4,323 |
| 1988 | Ordinary loss from business activities | (797,252) |
|      | Interest income | 838 |
| 1989 | Ordinary loss from business activities | (651,355) |
|      | Interest income | 75 |

B.  **As Reported on the Roses' Income Tax Returns**

On their joint income tax returns for 1990 through 1992, the Roses reported losses of $11,941, $868,812, and $651,355, respectively, with respect to their interest in Zephyr.

The Roses attached the following statement, in pertinent part, to their joint income tax return for 1990:

> The above mentioned taxpayers have elected to carryforward the net operating lossess [sic] of the following companies for the tax period ending 12/31/90:
>
> *    *    *    *    *    *    *
>
> The amount of $83,501.00 of unapplied net operating loss from Zephyr Rock & Lime Inc., (1987) * * * was carried forward to 1990.  Of this amount, $11,941 was applied in 1990 (Schedule E, line 31a) and the balance of $71,560 carried forward.
>
> In addition, unused outstanding amounts have been carried forward:  Zephyr Rock & Lime Inc., (1988) $797,252, * * * Zephyr Rock & Lime Inc (1989) of $651,355 * * *

This statement was signed by the Roses and dated October 12, 1991.  In sum, the Roses carried forward losses from Zephyr totaling $1,520,167.

The Roses attached the following statement, in pertinent part, to their joint income tax return for 1991:

> The above mentioned taxpayers have elected to carryforward the net operating lossess [sic] of the following companies for the tax period ending 12/31/91:

> * * * * * * *

> 4.   The amount of $651,355 unapplied net operating loss from Zephyr Rock & Lime, Inc. (1989) * * * has been carried forward.

This statement was signed by the Roses and dated October 14, 1992.

The Roses attached the following statement, in pertinent part, to their joint income tax return for 1992:

> The above mentioned taxpayers have elected to apply * * * the net operating losses of the following company for the tax period ending 12/31/92:

> * * * * * * *

> 5.   The amount of $651,355 of net operating losses from Zephyr Rock & Lime Inc. (1989) * * * have been applied.

C.   IRS Determinations

The IRS determined that the Roses could deduct the losses that they reported from Zephyr on their joint income tax returns for 1990, 1991, and 1992 to the extent of the basis in their Zephyr interest.  The IRS determined that, as of January 1, 1990,

the Roses' basis in their Zephyr interest was $810,431, which included the following amounts:

| Source | Amount |
|---|---|
| Original investment | $400,000 |
| Note given to Mills | 480,000 |
| Constructive dividends | 25,955 |
| Loss deducted in 1988 | (56,825) |
| Loss deducted in 1989 | (38,699) |

Furthermore, the IRS determined that, as of January 1, 1990, the Roses had not deducted $1,532,106 of their share of the losses that Zephyr had incurred during 1987, 1988, and 1989. After taking into consideration the $11,941 loss that the Roses claimed on their joint income tax return for 1990 with respect to their interest in Zephyr, the IRS determined that the Roses could deduct an additional $798,490 of Zephyr's losses in that year. The IRS determined that the Roses were not entitled to deduct any additional amount of Zephyr's losses on their joint income tax returns for 1991 and 1992. Accordingly, the IRS decreased the Roses' taxable income by $798,490 for 1990 and increased the Roses' taxable income by $868,812 for 1991 and $651,355 for 1992.

Transactions Involving SLPC, TPC, and the Roses During 1994 and 1995

Effective January 1, 1994, PK Ventures and its subsidiaries reorganized their corporate structure, which resulted in two surviving corporations--SLPC and TPC. As of that date, PK Ventures, TPTC, and TBPC were merged into TPC through transfers of stock. Both SLPC and TPC elected to be treated as

S corporations during 1994 and 1995. SLPC was wholly owned by Rose during 1994 and 1995. Rose also held an ownership interest in TPC during 1994 and 1995.

SLPC realized gross receipts or sales of zero in 1991, 1992, and 1993 and had a combined total income of $21,720 for those years. SLPC became insolvent during 1993. During 1994, SLPC incurred large losses because its pipeline was shut down for major repairs.

On December 31, 1994, Rose paid $350,000 of the amount that SLPC owed to TPC by reducing the amount that TPC owed to him. This transaction was recorded on TPC's books by journal entries that reduced the amount that it owed to Rose by $350,000 as well as the amount that SLPC owed to it by $350,000. The transaction was reflected on the books of SLPC by journal entries that reflected a $350,000 reduction in the amount that it owed to TPC and a $350,000 increase in the amount that it owed to Rose.

The Roses deducted losses from SLPC totaling $455,151 on their joint income tax return for 1994.

Rose paid an additional $800,000 of SLPC's debt to TPC during 1995 by reducing the amount that TPC owed to him. This transaction was recorded on TPC's books by journal entries that reduced the amount that it owed to Rose by $800,000 as well as the amount that SLPC owed to it by $800,000. The transaction was reflected on the books of SLPC by journal entries that reflected

an $800,000 reduction in the amount that it owed to TPC and an $800,000 increase in the amount that it owed to Rose.

The Roses deducted losses from SLPC totaling $322,973 on their joint income tax return for 1995.

As of February 5, 2004, the outstanding principal balance of the transactions between SLPC and the Roses was no less than the outstanding principal balance of those transactions as of 1995. Furthermore, between 1995 and February 5, 2004, the outstanding principal balance of the transactions between SLPC and the Roses remained substantially unchanged.

A.    As Described in SLPC and the Roses' Income Tax Returns

On the Schedule L attached to SLPC's Form 1120S for 1994, SLPC's "Other current liabilities" were reported to be $1,732,262 as of the beginning of that year and $2,727,575 as of the end of that year.  Of these amounts, SLPC reported that $1,730,997 and $2,711,734, respectively, were "DUE TO AFFILIATE". Also on this Schedule L, SLPC's "Loans from shareholders" were reported to equal $350,000 as of the end of 1994.  There were no amounts separately identified as interest payments made and/or imputed by SLPC to the Roses on its Form 1120S for 1994.

There were no amounts separately identified as interest payments received and/or imputed by the Roses from SLPC on their joint income tax return for 1994.

On the Schedule L attached to SLPC's Form 1120S for 1995, SLPC's "Other current liabilities" were reported to be $2,208,733 as of the end of that year. Of that amount, SLPC reported that $2,171,155 was "DUE TO AFFILIATE". Also on this Schedule L, SLPC's "Loans from shareholders" were reported to equal $1,219,000 as of the end of 1995. There were no amounts separately identified as interest payments made and/or imputed by SLPC to the Roses on its Form 1120S for 1995.

There were no amounts separately identified as interest payments received and/or imputed by the Roses from SLPC on their joint income tax return for 1995.

B.  IRS Determinations

The IRS determined that the Roses could deduct the losses that they reported from SLPC on their joint income tax returns for 1994 and 1995 to the extent of the basis in their SLPC interest. In calculating the Roses' basis in their SLPC interest for those years, the IRS determined that the $350,000 transaction between TPC and SLPC in 1994 and the $800,000 transaction between TPC and SLPC in 1995 did not constitute debt owed to the Roses and did not increase the Roses' basis in their SLPC interest. The IRS determined that "there was not an actual economic outlay" by the Roses and that "the debt was not directly attributable to" the Roses.

The IRS determined that the Roses had a $200,000 basis in their SLPC interest as of the end of 1994 and had no basis in their SLPC interest as of the end of 1995. Consequently, the IRS determined that the Roses could deduct $200,000 of SLPC's losses in 1994 and none of SLPC's losses in 1995. The IRS increased the Roses' taxable income by $255,151 for 1994 and by $322,973 for 1995.

Imposition of Accuracy-Related Penalties by the IRS

The Roses signed their joint income tax returns for 1990, 1991, 1992, and 1993 on October 12, 1991, October 14, 1992, October 15, 1993, and October 14, 1994, respectively. There was no paid preparer's information listed on any of these returns. There were no Forms 8275, Disclosure Statement, attached to these returns.

The IRS determined accuracy-related penalties under section 6662(a) with respect to the Roses for 1990, 1991, 1992, and 1993. The accuracy-related penalties were determined to be due to substantial understatements of income tax by the Roses for those years. The IRS determined that all or part of the underpayments of tax for those years was attributable to non-tax-shelter items (1) for which there was no substantial authority or (2) that were not adequately disclosed in the returns or in statements attached to the returns. Furthermore, the IRS determined that it had not

been established that these underpayments were due to reasonable cause.

OPINION

Procedural Matters

PKV&S and the Roses filed their respective petitions with the Court on March 25 and June 1, 1999. Rose, as the designated tax matters partner for PKVI LP, filed a Petition for Readjustment of Partnership Items Under Code Section 6226 with the Court on April 25, 1999.

By notices served on October 7, 1999, August 3, 2000, and May 10, 2001, these cases were set for trial 5 months after the dates of the respective notices. Attached to each of the Notices Setting Case for Trial was the Court's Standing Pretrial Order. The Standing Pretrial Order provided, in pertinent part, as follows:

> To facilitate an orderly and efficient disposition of all cases on the trial calendar, it is hereby
>
> ORDERED that all facts shall be stipulated to the maximum extent possible. All documentary and written evidence shall be marked and stipulated in accordance with Rule 91(b), unless the evidence is to be used solely to impeach the credibility of a witness. * * * Any documents or materials which a party expects to utilize in the event of trial (except solely for impeachment), but which are not stipulated, shall be identified in writing and exchanged by the parties at least 14 days before the first day of the trial session. The Court may refuse to receive in evidence any document or material not so stipulated or exchanged, unless otherwise agreed by the parties or allowed by the Court for good cause shown. * * *

On each of these occasions, the cases were continued on the joint motion (or request) of the parties. On three subsequent occasions, the cases were set for trial, Standing Pretrial Orders were served, and the cases were continued on motion of one of the parties.

On January 15, 2003, the Court issued Orders that, inter alia, required the parties to exchange all nonstipulation material, including any schedules, charts, and other documents that collected or summarized testimony or documents that were for impeachment purposes, by March 14, 2003, and required the parties to exchange a list of all documents already in the possession of opposing counsel.

On August 26, 2003, these cases were set for trial to commence on February 2, 2004. The parties were directed to comply with the Standing Pretrial Order that was served on April 22, 2003, a copy of which was attached.

During trial of these cases on February 4-6, 2004, petitioners attempted to move into evidence a large number of documents that had not been provided to respondent until sometime on or after January 19, 2004. A significant portion of these documents had not been provided to respondent until the morning of February 4, 2004. Respondent objected to many of these documents' being received in evidence on the grounds that the documents were hearsay and had not been exchanged in accordance

with the numerous Standing Pretrial Orders that the Court had issued in these cases. We sustained respondent's objections to those documents and summaries of those documents offered in evidence by petitioners. There was no excuse for the belated tender of documents, and we reaffirm our rulings on respondent's objections. The documents not received in evidence have not been considered in our findings of fact.

Issue #1--Transfers From PK Ventures to the Zephyr Purchasers

Whether a withdrawal of funds from a business by one of its owners or an advance made to a business by one of its owners creates a true debtor-creditor relationship is a factual question to be decided based on all of the relevant facts and circumstances. See Haag v. Commissioner, 88 T.C. 604, 615 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988); see also Haber v. Commissioner, 52 T.C. 255, 266 (1969), affd. 422 F.2d 198 (5th Cir. 1970); Roschuni v. Commissioner, 29 T.C. 1193, 1201-1202 (1958), affd. 271 F.2d 267 (5th Cir. 1959). For disbursements to constitute bona fide loans, there must have been, at the time that the funds were transferred, an unconditional obligation on the part of the transferee to repay the money and an unconditional intention on the part of the transferor to secure repayment. Haag v. Commissioner, supra at 615-616; see also Haber v. Commissioner, supra at 266. Direct evidence of a taxpayer's state of mind is generally unavailable,

so courts have focused on certain objective factors to distinguish bona fide loans from disguised dividends and other distributions, compensation, and contributions to capital.  The factors considered relevant for purposes of identifying bona fide loans include (1) the existence or nonexistence of a debt instrument; (2) provisions for security, interest payments, and a fixed payment date; (3) the right to enforce the payment of principal and interest; (4) whether repayments were made; (5) the source of the funds used to repay the creditor; (6) the failure of the debtor to pay on the due date or to seek a postponement; (7) a status equal to or inferior to that of regular business creditors; (8) "thin" or adequate capitalization; (9) the debtor's ability to obtain loans from outside lending institutions; (10) identity of interest between the business owner and the debtor or creditor; (11) the extent of a business owner/creditor's participation in management; and (12) treatment of the transferred funds on the business's books.  See Estate of Mixon v. United States, 464 F.2d 394, 402 (5th Cir. 1972); In re Indian Lake Estates, Inc., 448 F.2d 574, 578-579 (5th Cir. 1971); see also Haag v. Commissioner, supra at 616-617 & n.6; Haber v. Commissioner, supra at 266.  Each case turns on its own factors, and "'differing circumstances may bring different factors to the fore.'"  Jones v. United States, 659 F.2d 618, 622 (5th Cir. 1981) (quoting Slappey Drive Ind. Park v. United States, 561 F.2d

572, 581 (5th Cir. 1977)).  When the transferee or transferor is in substantial control of the business, such control invites a special scrutiny of the situation.  See Haber v. Commissioner, supra at 266; Roschuni v. Commissioner, supra at 1202; see also Tulia Feedlot, Inc. v. United States, 513 F.2d 800, 805 (5th Cir. 1975).  We have applied these principles when analyzing transfers between two closely held businesses that share a common ownership but are otherwise unrelated.  See, e.g., Stinnett's Pontiac Serv., Inc. v. Commissioner, T.C. Memo. 1982-314, affd. 730 F.2d 634 (11th Cir. 1984); see also Marcy v. Commissioner, T.C. Memo. 1994-534.

Petitioners contend that the facts and circumstances of these cases establish that transfers from PK Ventures to the Zephyr purchasers were bona fide loans.  Furthermore, petitioners contend that these alleged debts became worthless during the years in which PKV&S claimed bad debt deductions on its consolidated income tax returns.  Conversely, respondent contends that the facts and circumstances of these cases establish that the transfers were not bona fide loans.  Respondent also contends that, in any event, none of these alleged debts became worthless during the years in which PKV&S claimed bad debt deductions on its consolidated income tax returns.  We consider these contentions below.

Petitioners contend that, because the Summit Trust loan was a bona fide loan, the transfers from PK Ventures to the Zephyr purchasers were also bona fide loans. Petitioners are essentially relying on the circumstances surrounding the Summit Trust loan to establish that the transfers from PK Ventures to the Zephyr purchasers were bona fide loans. Petitioners do not cite any authority to support this contention. After considering the relevant factors and weighing the evidence, we reject petitioners' contention that the transfers from PK Ventures to the Zephyr purchasers were bona fide loans for the reasons discussed below.

First, PK Ventures did not receive promissory notes from the Zephyr purchasers in exchange for its transfer of $1 million to them.

Second, no evidence indicates that the Zephyr purchasers made any agreement with PK Ventures as to the time of repayment or the interest to be paid.

Third, while PK Ventures provided security for its repayment of the Summit Trust loan to Summit Trust, no evidence indicates that the Zephyr purchasers provided any collateral or security for repayment of the transfers that they received from PK Ventures.

Fourth, the Zephyr purchasers did not make any payments of principal or interest to PK Ventures, and no accrued interest

attributable to these transfers was posted to PK Ventures'
general ledger or reported in its audited financial statements.
Furthermore, there is no indication that any accrued interest
attributable to these transfers was reported in PKV&S's
consolidated income tax returns for 1987, 1988, 1989, 1990, or
1991.

Fifth, no evidence indicates that PK Ventures had the right
to enforce the payment of principal and interest with respect to
its transfers to the Zephyr purchasers.

Sixth, 9 of the 10 Zephyr purchasers were shareholders of
PK Ventures.  As of August 20, 1987, these nine Zephyr purchasers
owned 99.47 percent of the stock of PK Ventures.  Of the
$1 million transferred from PK Ventures to the Zephyr purchasers,
Rose received $400,000, an amount proportional to his 40-percent
interest in PK Ventures.  There is no evidence of the specific
amounts transferred from PK Ventures to each of the nine other
Zephyr purchasers.

Seventh, based upon Rose's experience in corporate finance,
we are convinced that he could have documented the transfers from
PK Ventures to the Zephyr purchasers with promissory notes and
arranged for these transfers to occur under terms significantly
closer to arm's length than those that were actually chosen.
This conclusion is bolstered by our consideration of the
structure and formality of (1) the financing arrangements into

which PK Ventures had entered in connection with the purchase of the stock of SLPC, TBPC, TPC, and TPTC; (2) the Summit Trust loan; (3) the financing arrangements into which Rose had entered in connection with his acquisition of control of PK Ventures during 1990; and (4) the financing arrangements between PKVI LP and unrelated parties.

Eighth, the labels given to the transfers from PK Ventures to the Zephyr purchasers on PK Ventures' audited financial statements for the years ended December 31, 1987, December 31, 1988, and December 31, 1989, and on the Schedules L attached to PKV&S's consolidated income tax returns for 1987, 1988, and 1989 cannot overcome the substance of these transfers. See Estate of Mixon v. United States, 464 F.2d at 403-404; cf. Gregory v. Helvering, 293 U.S. 465, 468-470 (1935). Based upon our analysis of the relevant factors, we conclude that these transfers were, in substance, distributions of property from PK Ventures to its shareholders.

Because the transfers from PK Ventures to the Zephyr purchasers were not bona fide loans, we need not decide questions of worthlessness and timing. See sec. 1.166-1(c), Income Tax Regs. ("Only a bona fide debt qualifies for purposes of section 166."). Accordingly, we sustain respondent's determination that PKV&S is not entitled to bad debt deductions of $600,000 and $400,000 on its consolidated income tax returns for 1990 and

1991, respectively, for the transfers from PK Ventures to the Zephyr purchasers.

Respondent determined that PK Ventures' transfer of $400,000 to Rose in connection with the Zephyr purchase constituted a constructive dividend to him in 1990. Consequently, respondent increased the Roses' taxable income by $400,000 in 1990 and determined that the Roses should not have reported $400,000 of cancellation of indebtedness income on their joint income tax return for 1991. We agree that the Roses should not have reported $400,000 of cancellation of indebtedness income on their joint income tax return for 1991 because, as we discussed above, PK Ventures' transfer of $400,000 to Rose in connection with the Zephyr purchase was not a bona fide loan. With respect to respondent's treatment of the $400,000 transfer as a dividend distribution in 1990, petitioners contend that, because the transfer occurred in 1987, the transfer could only be a dividend distribution to Rose in that year rather than in 1990. Respondent has not offered an explanation as to why this $400,000 transfer should be treated as a dividend distribution to Rose in 1990. Because we have decided that the transfer from PK Ventures to Rose in connection with the Zephyr purchase was not a bona fide loan, we agree with petitioners, and we hold that the transfer is not a dividend distribution to Rose in 1990 (or in any of the other years before the Court in these cases). See

sec. 1.301-1(b), Income Tax Regs.; see also R&T Developers, Inc. v. Commissioner, T.C. Memo. 1973-128; Gurtman v. United States, 237 F. Supp. 533, 537-538 (D.N.J. 1965), affd. per curiam on other issues 353 F.2d 212 (3d Cir. 1965).

Issue #2--Transfers From PK Ventures, TBPC, and TPTC to PKVI LP

Approximately two-thirds ($1,096,250 out of $1,516,246) transferred from PK Ventures and its subsidiaries to PKVI LP was transferred during 1986 through 1990. An FPAA was issued to PKVI LP only for 1991. PKVI LP was a partnership subject to the provisions of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), partially codified at secs. 6221-6233. The parties agree that the characterization of transfers from a partner to a TEFRA partnership as debt or equity is a "partnership item" that can be adjusted only upon issuance of an FPAA. See sec. 301.6231(a)(3)-1(a)(4), 301-6231(a)(3)-1(c)(2)(i), Proced. & Admin. Regs. In the absence of a valid FPAA for a particular year, neither respondent nor the Court may adjust partnership items for that year. See generally Maxwell v. Commissioner, 87 T.C. 783, 788-789 (1986).

For 1991, however, in the FPAA sent to PKVI LP, respondent disallowed interest expense in the amount of $100,661 because it had not been established that the interest expense was attributable to a bona fide debt. Thus, in determining whether that interest expense deduction is allowable, we have found facts

relating to the transfers and applied the factors discussed in the preceding section to determine whether the transfers were bona fide debt or capital contributions.

Petitioners argue that the following factors support their contention that the transfers from PK Ventures, TBPC, and TPTC to PKVI LP during 1986 through 1991 were bona fide loans: (1) Formal indicia of debt, (2) risk involved, (3) participation in management and identity of interest, (4) intent of the parties (5) capitalization, (6) independent financing, and (7) acquisition of capital assets and failure to repay on the due date. In making their argument, petitioners do not attempt to distinguish the transfers from TBPC and TPTC to PKVI LP from the transfers between PK Ventures and PKVI LP. Accordingly, from this point forward, we refer to these transfers as occurring between PK Ventures and PKVI LP. After considering the relevant factors and weighing the evidence, we reject petitioners' contention that the transfers from PK Ventures to PKVI LP were bona fide loans for the reasons discussed below.

First, we are unpersuaded that the PKVI LP promissory notes are reliable evidence of any indebtedness between PKVI LP and PK Ventures. There is no indication that the PKVI LP promissory notes were completed contemporaneously with PKVI LP's receipt of funds from PK Ventures. Rather, Rose testified that his preparation of the PKVI LP promissory notes was "ministerial" and

completed on a cumulative basis, so as to account for the total amount of the transfers from PK Ventures to PKVI LP in preparation for the yearly audit of these businesses' financial records.  Moreover, at the time that Rose signed the $1,516,246 promissory note (i.e., the note representing the aggregate amount of the transfers from PK Ventures to PKVI LP during 1986 through 1991), Rose, as a general partner with a 70-percent interest in PKVI LP, neither intended to have PKVI LP repay any of this amount to PK Ventures nor intended to repay any of this amount himself.  These facts undermine the reliability of the PKVI LP promissory notes.  In addition, the purported terms of the PKVI LP promissory notes were contradicted by the statements made in PKVI LP's audited financial statements for the year ended December 31, 1990, and PKV&S's audited consolidated financial statements for the year ended December 31, 1991, that the transfers from PK Ventures, TBPC, and TPTC to PKVI LP did not bear interest.  Accordingly, we are unpersuaded that the existence of the PKVI LP promissory notes justifies a conclusion that the transfers from PK Ventures to PKVI LP were bona fide loans.

Second, unlike the basic structure of PKVI LP's debt to unrelated parties, the transfers from PK Ventures to PKVI LP were not secured by the hydroelectric properties owned by PKVI LP; did not have a fixed payment date; and, as established by PKVI LP's

audited financial statements for the year ended December 31, 1990, and PKV&S's audited consolidated financial statements for the year ended December 31, 1991, did not bear interest.

Third, no evidence indicates that PKVI LP actually made any payments of principal or interest to PK Ventures. Moreover, PKV&S's inconsistent reporting of imputed interest payments from PKVI LP on its consolidated income tax returns for 1987 through 1991 does not persuade us that the transfers from PK Ventures to PKVI LP were bona fide loans.

Fourth, no evidence indicates that PK Ventures had the right to enforce the payment of principal or interest with respect to its transfers to PKVI LP. Rather, PK Ventures and PKVI LP agreed that PKVI LP would not make any payments of principal or interest if such payments would have caused it to default or breach any other note or agreement to which it was a party. This agreement subordinated the right of PK Ventures to demand payment of its transfers to PKVI LP to the rights of PKVI LP's creditors.

Fifth, PKVI LP was thinly capitalized. PKVI LP reported $50,000 of capital contributions on its books. PKVI LP had approximately 24 times more debt to unrelated parties than it had equity at the end of 1986, 37 times more at the end of 1987, 45 times more at the end of 1988 and 1989, 42 times more at the end of 1990, and 45 times more at the end of 1991. If the transfers from PK Ventures to PKVI LP are treated as debt and

included in this analysis, these ratios would increase to approximately 54:1 at the end of 1989, 64:1 at the end of 1990, and 75:1 at the end of 1991. PKVI LP was experiencing serious financial difficulties as of 1989, and these difficulties continued through 1990 and 1991.

Sixth, after 1988, PKVI LP was unable to obtain any additional financing from unrelated parties other than a $125,000 loan from First Fidelity. PKVI LP entered into this loan agreement with First Fidelity on or before October 16, 1989. PKVI LP was also able to renegotiate its outstanding loan agreements with Liberty Life and MGFP between December 31, 1989, and December 31, 1991, but no additional financing was provided to PKVI LP by either Liberty Life or MGFP as part of these renegotiated agreements. Furthermore, a substantial portion (if not all) of the $1,516,246 that was transferred from PK Ventures to PKVI LP was received by PKVI LP during and after 1989. The timing of the transfers from PK Ventures to PKVI LP coupled with PKVI LP's inability to obtain additional financing from unrelated parties does not support a conclusion that the transfers from PK Ventures to PKVI LP were bona fide loans.

Seventh, besides the initial capital contributions that were made to PKVI LP, no evidence indicates that any of PKVI LP's limited partners other than PK Ventures transferred funds to the partnership between September 15, 1986, and December 7, 1990.

During that period, PK Ventures' limited partnership interest in PKVI LP increased from zero to 29 percent (i.e., PK Ventures acquired the entire limited partnership interest in PKVI LP). PK Ventures' increased ownership interest in PKVI LP was due, in large part, to partners owning at least 24.65 percent of PKVI LP's limited partnership interests assigning their interests in the partnership to PK Ventures for apparently no consideration other than relief from the partnership's liabilities. Furthermore, these assignments occurred during the time in which PKVI LP was experiencing serious financial difficulties. These facts do not support a conclusion that the transfers from PK Ventures to PKVI LP were bona fide loans. Rather, these facts indicate that PK Ventures gained a greater ownership interest in PKVI LP by its willingness to assume the liabilities of the partnership and to provide the partnership with capital to pay those liabilities.

Eighth, as a result of holding approximately 76 percent of the partnership interests in PKVI LP as of February 16, 1990, Rose and PK Ventures gained the exclusive right, power, and authority to make calls for additional capital contributions on behalf of PKVI LP, to permit a withdrawal of capital by any partner, to admit an additional partner to the partnership, to permit the withdrawal of any partner from the partnership, to designate any additional investments for the partnership and to

determine the participating percentages of the partners in such additional investments, to sell or otherwise dispose of all or substantially all of the partnership's property attributable to any investment, to permit any agreement between the partnership and any general partner or any person controlled by or controlling or under common control with a general partner, and to permit the transfer or assignment, in whole or in part, by a partner of his interest in the partnership. Prior to February 16, 1990, PK Ventures needed the approval of limited partners holding at least 67 percent of the aggregate voting percentages of the limited partners of PKVI LP to exercise its authority over these matters. PK Ventures' increased participation in PKVI LP's affairs during the time in which it was transferring significant amounts of funds to the partnership does not support a conclusion that the transfers from PK Ventures to PKVI LP were bona fide loans.

Ninth, based upon Rose's experience in corporate finance, we are convinced that he could have arranged for the transfers from PK Ventures to PKVI LP to occur under terms significantly closer to arm's length than those that were actually chosen. This conclusion is bolstered by our consideration of the structure and formality of (1) the financing arrangements into which PK Ventures had entered in connection with the purchase of the stock of SLPC, TBPC, TPC, and TPTC; (2) the Summit Trust loan;

(3) the financing arrangements into which Rose had entered in connection with his acquisition of control of PK Ventures during 1990; and (4) the financing arrangements between PKVI LP and unrelated parties.

Tenth, although some of the labels used to describe the transfers from PK Ventures to PKVI LP on these businesses' books classified the transfers as debt, these labels cannot overcome the substance of these transfers. See Estate of Mixon v. United States, 464 F.2d at 403-404; cf. Gregory v. Helvering, 293 U.S. at 468-470. Based upon our analysis of the relevant factors, we conclude that these transfers were, in substance, contributions of capital from PK Ventures to PKVI LP.

Based on the foregoing, we sustain respondent's determination that PKVI LP should not have deducted $100,661 of interest expense on its Form 1065 for 1991 with respect to these transfers. The parties agree, and the Court is persuaded, that we do not have jurisdiction over the adjustments made in the notice of deficiency sent to PKV&S with respect to imputed interest income reported on Forms 1120 for 1990 and 1991 and a bad debt deduction claimed on Form 1120 for 1991.

Issue #3--Transfers From PK Ventures, TBPC, and TPTC to Zephyr

The characterization of transfers from PK Ventures and its subsidiaries to Zephyr is relevant only to the bad debt deductions claimed by PKV&S and disallowed in the notice of

deficiency for 1989 and 1990. For those years, the treatment of Zephyr's liabilities was an S corporation item, to be determined at the corporate level. See sec. 301.6245-1T(a)(5), Temporary Income Tax Regs., 52 Fed. Reg. 3003 (Jan. 30, 1987). (For years beginning after December 31, 1996, these procedures do not apply. See Small Business Job Protection Act of 1996, Pub. L. 104-188, 110 Stat. 1755.) Because no notice of administrative adjustment (FSAA) was issued to Zephyr, the nature of the transfers as reported by Zephyr cannot be redetermined here.

Issues #4 and #5--Partners' Basis in PKVI LP

Generally, a partner may deduct the partner's distributive share of losses of a partnership in which the partner is a member. Sec. 702(a). A partner's distributive share of partnership loss is limited to the extent of the adjusted basis (before reduction by current year's losses) of the partner's interest in the partnership at the end of the partnership year in which such loss occurred. Sec. 704(d); sec. 1.704-1(d)(1), Income Tax Regs. A partner's share of loss in excess of the partner's adjusted basis at the end of the partnership year will not be allowed for that year. Sec. 1.704-1(d)(1), Income Tax Regs. Any excess of such loss over such basis shall be allowed as a deduction at the end of the partnership year in which such excess is repaid to the partnership. Sec. 704(d); see also sec. 1.704-1(d)(1), Income Tax Regs. ("[A]ny loss so disallowed shall

be allowed as a deduction at the end of the first succeeding partnership taxable year, and subsequent partnership taxable years, to the extent that the partner's adjusted basis for his partnership interest at the end of any such year exceeds zero (before reduction by such loss for such year).").

Section 465 imposes a further limitation on a partner's distributive share of partnership losses. Under section 465, losses relating to activities engaged in by a taxpayer in carrying on a trade or business or for the production of income are allowed as deductions only to the extent that the taxpayer is at risk financially with respect to the activities. Sec. 465(a)(1), (c)(3). Investors generally are considered to be at risk financially to the extent that they contribute money to the activities. Sec. 465(b)(1)(A). In addition, investors are considered to be at risk financially with respect to third-party debt obligations relating to the activities to the extent that they are personally liable for repayment of the debt obligations or to the extent that they have pledged property, other than property used in the activities, as security for the debt obligations. Sec. 465(b)(1)(B) and (2). The determination of whether a taxpayer is to be regarded as at risk on a particular debt obligation is to be made at the end of each taxable year. Sec. 465(a)(1); Levy v. Commissioner, 91 T.C. 838, 862 (1988).

Section 465 does not affect either the amount of a partner's distributive share of partnership loss that the partner is otherwise allowed to deduct under section 704(d) or the adjustment that must be made to the basis of the partner's interest in the partnership under section 705(a)(2)(A) as a result of that loss deduction. See, e.g., Allen v. Commissioner, T.C. Memo. 1988-166. If the amount of partnership loss that a partner is allowed to deduct under section 704(d) exceeds the amount for which the partner is at risk under section 465, however, such excess is subject to the carryover provisions of section 465(a)(2). See, e.g., id. Section 465(a)(2) provides that this excess amount shall be carried over to succeeding years. These losses will be deductible when the taxpayer injects more funds into the activity. Id.

In these cases, the parties dispute whether PK Ventures had sufficient basis in its PKVI LP interest during 1990, 1991, 1992, and 1993 to deduct the losses that it claimed from PKVI LP on PKV&S's consolidated income tax returns for those years and whether the Roses had sufficient basis in their PKVI LP interest during 1990, 1991, 1992, 1993, 1994, and 1995 to deduct the losses that they claimed from PKVI LP on their joint Federal income tax returns for those years. The parties also dispute whether PK Ventures and the Roses are limited by the "at risk" rules of section 465 with respect to these loss deductions.

A partner's adjusted basis in the partner's interest in the partnership is the basis of such interest determined under section 722, increased by the partner's distributive share of income and decreased by the partner's distributive share of loss and applicable expenditures.  Sec. 705(a)(1) and (2).  The basis of an interest in a partnership acquired by a contribution of property, including money, is the amount of money and the adjusted basis of such property to the partner at the time of contribution, increased by the amount of any gain recognized under section 721(b) at the time.  Sec. 722.  Any increase in a partner's share of the liabilities of the partnership is considered a contribution of money by such partner to the partnership and, consequently, increases the basis of the partner's interest in the partnership.  Secs. 705(a), 722, 752(a).  Any decrease in a partner's share of the liabilities of the partnership is considered a distribution of money to the partner by the partnership and, consequently, decreases the basis of the partner's interest in the partnership.  Secs. 705(a)(2), 733, 752(b).  The basis of a partner's interest in the partnership cannot be decreased below zero.  See sec. 705(a).

Calculation of the Roses' basis and of PK Venture's basis in their respective PKVI LP interests for purposes of these cases must be consistent with treatment of the transfers from PK Ventures and its subsidiaries to PKVI LP on the latter's returns

for the years of the transfers.  With respect to 1991, however, we have determined the character of those transfers and have jurisdiction to do so as a result of respondent's disallowance of imputed interest expense in the FPAA issued for 1991.

Petitioners argue that respondent did not specifically recharacterize the transfers in the FPAA and that respondent waived any adjustments other than interest expense based on recharacterization of those transfers and is precluded from raising them in this proceeding.  Respondent argues that the Court does have jurisdiction to resolve the character of the transfers for all of the years but acknowledges that the tax effects of our conclusions require separate analysis.  The nature of the transfers was tried by consent and was the predominant issue during trial and in the briefs of the parties.  Thus, transfers during 1991 should be regarded as equity contributions to PKVI LP in the calculation of the partners' basis, but transfers prior to and subsequent to 1991 shall be treated for basis purposes consistent with reporting on PKVI LP's returns.  Similarly, any other adjustments over which we have no jurisdiction should not be included in the basis calculations for purposes of this case.

Issue #6--The Roses' Basis in Their Zephyr Interest

An S corporation's income, losses, and deductions are passed through pro rata to its shareholders.  See sec. 1366(a).  The

total amount of the S corporation's losses and deductions that can be passed through to a shareholder in any taxable year is limited to the sum of that shareholder's adjusted basis in his or her stock and the adjusted basis of any indebtedness owed by the corporation to that shareholder. Sec. 1366(d)(1). A taxpayer's share of any S corporation loss in excess of his or her adjusted basis may be carried over indefinitely. Sec. 1366(d)(2).

In these cases, the parties dispute whether the Roses had a sufficient basis in their Zephyr interest during 1990, 1991, and 1992 to deduct the losses that they claimed from that S corporation on their joint Federal income tax returns for those years. Whether or not an FSAA was sent to Zephyr for 1990, no such notice is before the Court in these cases. Thus, we do not have jurisdiction to redetermine Zephyr's actual income or loss and the consequential increases or decrease in basis.

The Roses did not assign error in their petition to respondent's determination of their basis in their Zephyr interest during 1990, 1991, and 1992. Under Rule 34(b)(4), any issue not raised in the assignment of errors is deemed conceded by the taxpayer. Jarvis v. Commissioner, 78 T.C. 646, 658 (1982); Gordon v. Commissioner, 73 T.C. 736, 739 (1980). Furthermore, the Roses made the following concession in their petition with respect to that determination:

> a. The Petitioners concede the adjustments
> proposed by the Respondent with respect to Zephyr Rock

& Lime, Inc. (Adjustment C) wherein the Respondent proposes to allow the Petitioners an additional deduction in 1990 in the amount of $798,490.00 and to disallow deductions in 1991 and 1992 in the amounts of $868,812.00 and $615,355.00, respectively.

Subsequent to the Roses' filing their petition with the Court, the Supreme Court issued its opinion in <u>Gitlitz v. Commissioner</u>, 531 U.S. 206 (2001).  In <u>Gitlitz v. Commissioner</u>, <u>supra</u>, the Supreme Court held that shareholders of an insolvent S corporation may increase their basis in their interest in the S corporation by their pro rata share of cancellation of indebtedness (COD) income to the S corporation.  <u>Id.</u> at 212-216.

Petitioners filed their trial memorandum with the Court on February 4, 2004.  In their trial memorandum, petitioners made the following assertion:

> The Commissioner has failed to increase Mr. Rose's basis in Zephyr to account for Rose's proportionate share of excluded cancellation of indebtedness income arising from the Zephyr Bankruptcy.  Mr. Rose's basis should be increased by approximately $1,900,000 to reflect the amount of this <u>Gitlitz</u> adjustment.  * * *

In respondent's trial memorandum, also filed with the Court on February 4, 2004, respondent claimed that the following issue was unresolved:  "22.  Whether petitioners have sufficient basis to deduct claimed flow-through losses from Zephyr Rock & Lime, Inc. in 1990, 1991, and 1992?"

In their posttrial briefs dealing with basis issue, petitioners contended that the Supreme Court's holding in <u>Gitlitz v. Commissioner</u>, <u>supra</u>, should allow the Roses to increase their

basis in their Zephyr interest by their share of Zephyr's COD income resulting from its bankruptcy. Petitioners further contended that Zephyr recognized COD income in 1989 and that the Roses' share of Zephyr's COD income was, at a minimum, approximately $1,110,570. Petitioners supported their argument by Rose's testimony at trial concerning Zephyr's outstanding liabilities in 1988 and 1989. Petitioners concluded:

> With the upward adjustment of Rose's basis resulting
> from the pass through of income from discharge of
> indebtedness that is excluded from gross income under
> section 108(a), Rose may deduct his share of Zephyr's
> losses up to the amount of his basis, including any
> losses that were previously suspended at the corporate
> level because of a lack of basis in prior years.

Conversely, respondent contended that Gitlitz v. Commissioner, supra, "does not create a situation in which a taxpayer is allowed an increase in basis without any proof that a debt has been discharged or the amount thereof." Respondent further contended that "petitioners have offered no proof whatsoever regarding the amount of any debt which was discharged in Zephyr Rock's Chapter 11 proceeding, seeking instead to rely on the principle established by the Supreme Court in Gitlitz without proving the amount of the purported debt discharged." Respondent concluded that "petitioners have failed to present any evidence establishing or to otherwise support a tax basis in excess of the amount which the respondent has agreed to allow." In respondent's supplemental brief, respondent conceded, however,

that, as of November 20, 1989, the Roses had additional basis of $149,109 in their Zephyr interest as a result of the discharge of Zephyr's indebtedness through its bankruptcy proceeding. In making this concession, respondent asserted: "The evidence relied upon by the respondent in support of this concession is not part of the record of these cases; this concession is based upon documentation that was supplied to the respondent several months after the trial record for these cases was closed".

Petitioners raised two additional contentions for the first time in their supplemental brief filed August 19, 2004. The first contention dealt with respondent's determination to include a $480,000 note that Rose gave to Mills in the calculation of Roses' basis in their Zephyr interest. The second contention dealt with treating the entire amount of the transfers from PK Ventures, TBPC, and TPTC to Zephyr as constructive dividends to Rose. Because these contentions were raised by petitioners for the first time in their supplemental brief, we did not consider them in reaching our decisions in these cases. See Rules 31(a), 41(a); Krause v. Commissioner, 99 T.C. 132, 177 (1992), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994); DiLeo v. Commissioner, 96 T.C. 858, 891 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Foil v. Commissioner, 92 T.C. 376, 418 (1989), affd. 920 F.2d 1196 (5th Cir. 1990); Markwardt v. Commissioner, 64 T.C. 989, 997 (1975).

In respondent's supplemental brief, filed August 12, 2004, respondent attempted to amend respondent's determination to include the $25,955 of constructive dividends in the Roses' basis in their Zephyr interest and thus increase the deficiency determined against the Roses. Respondent did not seek to raise this new position at or before trial of these cases. Furthermore, respondent had not argued that respondent's determination to treat a portion of the transfers from PK Ventures, TBPC, and TPTC to Zephyr as a constructive dividend to the Roses was incorrect.

In their memorandum in support of their motion for reconsideration of findings and opinion, filed 2 months after release of our now-withdrawn opinion, petitioners contended for the first time that the statutory notice of deficiency sent to the Roses--

> is invalid to the extent it excludes from the Roses' basis in Zephyr a proportionate share of Zephyr's excluded COD income. Moreover, since respondent failed to adjust Zephyr's excluded COD income in a FSAA issued to Zephyr, this Court did not have jurisdiction to sustain respondent's adjustment. To be clear, petitioners do not argue that the Court is without jurisdiction to determine the Roses' outside basis in Zephyr. Rather, petitioners argue only that the Court did not have jurisdiction to determine the Roses' (or any other shareholder's) share of Zephyr's excluded COD income in a shareholder level proceeding.

At the time of hearing on petitioners' motion for reconsideration, the parties agreed that the Court lacked jurisdiction to redetermine the Roses' basis in their Zephyr

interest.  Petitioners argued, for the first time, that "We really think that the issue here is the 1990 return, not the 1989 return."  Petitioners then proceeded to argue that the Schedule L to Zephyr's Form 1120S for 1990 reflected COD income, which was not required to be "reported" because of section 108. Petitioners now argue that such COD income must be reflected in the calculation of the Roses' basis in Zephyr.

As detailed in our findings of fact, supra pp. 30-33, no direct references were made and no explanations were provided in Zephyr's Forms 1120S as to the amounts that Zephyr received from PK Ventures and its subsidiaries for years prior to 1990.  On its Form 1120S for 1990, Zephyr represented that "No income or expense items where [sic] reported on the tax return due to the fact that the corporation was not solvent after the completion of the bankruptcy."  Petitioners now argue that COD income was reflected on Zephyr's return in an attachment, although not on the face of the return, because (1) Zephyr's net loss from operations was eliminated by the amount of excluded COD income and (2) in Schedule L to the Form 1120 for 1990, assets and liabilities were eliminated and retained earnings were increased to reflect COD income of $7,144,750 that was excluded under section 108.

Respondent argues that the Court lacks jurisdiction to increase the basis of the Roses in Zephyr as belatedly sought by

petitioners.  Respondent contends that the Court had no jurisdiction to determine basis in excess of the amounts determined in the statutory notice, which did not depend on recharacterization or any other determination that would cause the Roses' basis in Zephyr to become a partnership item. Respondent notes that the Roses did not report any COD income from Zephyr for 1989 or 1990 and disputes petitioners' contention with respect to the effect of the Schedule L to the 1990 return. Respondent also contends that the Court lacks jurisdiction to increase the Roses' basis in Zephyr in accordance with respondent's concession.

In view of the extended history of these cases, we believe that the interests of justice are best served, and jurisdiction is not implicated, by accepting the Roses' concession in their petition of the correctness of respondent's determination of basis, as supplemented by respondent's concession of increased basis.  We do not believe that we are required to increase basis in accordance with Zephyr's 1990 return consistent with a claim made for the first time in a motion for reconsideration and based on an analysis different from and inconsistent with the claim made prior to and during trial and in posttrial briefs specifically addressed to that issue.  The notice of deficiency that was sent to the Roses does not purport to redetermine COD income or any other entity-level item, so cases holding notices

of deficiency invalid as to items where there has not been a prior entity-level proceeding are not in point. See Roberts v. Commissioner, 94 T.C. 853, 860-861 (1990). As detailed in our findings of fact, no direct references were made and no explanations were provided in Zephyr's Forms 1120S as to the amounts that Zephyr received from PK Ventures and its subsidiaries for years prior to 1990. On its Form 1120S for 1990, Zephyr represented that "No income or expense items where [sic] reported on the tax return due to the fact that the corporation was not solvent after the completion of the bankruptcy." Petitioners now argue that cancellation of indebtedness income was reflected on Zephyr's return in an attachment, although not on the face of the return, because (1) Zephyr's net loss from operations was eliminated by the amount of excluded COD income and (2) in Schedule L to the Form 1120 for 1990, assets and liabilities were eliminated and retained earnings were increased to reflect COD income of $7,144,750 that was excluded under section 108.

Petitioners would have the notice of deficiency make an affirmative adjustment in the absence of an entity-level proceeding reflected in an FSAA. Respondent contends that the claim of increased basis could have been raised by the Roses in an administrative adjustment request under section 6227 but that such a request is now barred. We conclude, however, that the

burden of timely pleading and proving an increase in basis was on petitioners here, and they did not do so in a timely manner. Thus, the starting point for calculation of the Roses' basis will be the notice of deficiency, and the only adjustments to that amount will be for items conceded by respondent or determined within the scope of our jurisdiction in these cases.

Issue #7--The Roses' Basis in Their SLPC Interest

Petitioners contend that the Roses' basis in their SLPC interest should be increased as a result of the $350,000 transaction that occurred between SLPC, TPC, and Rose during 1994 and the $800,000 transaction that occurred between SLPC, TPC, and Rose during 1995. In support of this contention, petitioners argue that respondent has conceded the bona fides of the transactions between SLPC, TPC, and Rose during 1994 and 1995 through the following stipulation:

At December 31, 1994, Mr. Rose paid $350,000 of the amount which St. Louis owed Tampa Pipeline Corporation by reducing the amount which Tampa Pipeline Corporation owed him.

The transaction was recorded on Tampa Pipeline Corporation's books by a journal entry reducing the amount which it owed Rose by $350,000 and reducing the amount which St. Louis Pipeline owed it by $350,000. The transaction was recorded in the audited financial statements and tax returns for 1994.

The transaction was reflected on the books of St. Louis Pipeline by a journal entry reflecting a $350,000 reduction it owed Tampa Pipeline Company and an increase of $350,000 in the amount it owed Rose. During 1995, Rose paid an additional $800,000 of

St. Louis Pipeline's debt to Tampa Pipeline Company
* * * [by] reducing the amount Tampa Pipeline owed him.

Tampa Pipeline recorded the 1995 transaction by a journal entry reducing by $800,000 the amount which it owed Rose and the amount which St. Louis Pipeline owed Tampa Pipeline. St. Louis Pipeline also recorded the transaction in a journal entry, reducing its indebtedness to Tampa Pipeline by $800,000, and increasing its indebtedness to Rose by $800,000.

The transaction was recorded in the audited financial statements and the tax returns for 1995.

In further support of this contention, petitioners argue that the transactions between SLPC, TPC, and Rose were more than mere book entries and "that a change in Rose's rights to repayment has, in fact, occurred". Petitioners cite only Rev. Rul. 75-144, 1975-1 C.B. 277, in support of their contention. Conversely, respondent contends that the Roses' basis in their SLPC interest should not be increased as a result of the $350,000 transaction that occurred between SLPC, TPC, and Rose during 1994 and the $800,000 transaction that occurred between SLPC, TPC, and Rose during 1995. In support of this contention, respondent argues that the transactions between SLPC, TPC, and Rose during 1994 and 1995 "were merely book entries, lacking economic substance of any sort." As discussed below, we agree with respondent.

We are unpersuaded that the quoted stipulation is any kind of concession on the part of respondent. The stipulation merely outlines the manner in which the transactions between SLPC, TPC, and Rose during 1994 and 1995 were recorded on the books of SLPC

and TPC. The stipulation neither establishes that these transactions had economic substance nor that these transactions gave rise to a bona fide debt between SLPC and Rose.

An S corporation shareholder must make an actual economic outlay to the S corporation in order to increase the basis of his or her interest in the S corporation. Bergman v. United States, 174 F.3d 928, 932 (8th Cir. 1999); see also Selfe v. United States, 778 F.2d 769, 772 (11th Cir. 1985); Underwood v. Commissioner, 535 F.2d 309, 311-313 (5th Cir. 1976), affg. 63 T.C. 468 (1975); Hitchins v. Commissioner, 103 T.C. 711, 715 (1994). A shareholder makes an actual economic outlay to an S corporation by engaging in a transaction that leaves "'the taxpayer poorer in a material sense'" when fully consummated. Perry v. Commissioner, 54 T.C. 1293, 1296 (1970) (quoting Horne v. Commissioner, 5 T.C. 250, 254 (1945)), affd. 27 AFTR 2d 71-1464, 71-2 USTC par. 9502 (8th Cir. 1971).

Petitioners have failed to address the myriad cases involving transactions factually similar to or indistinguishable from the transactions between SLPC, TPC, and the Roses during 1994 and 1995. See, e.g., Underwood v. Commissioner, supra; Bhatia v. Commissioner, T.C. Memo. 1996-429; Wilson v. Commissioner, T.C. Memo. 1991-544; Griffith v. Commissioner, T.C. Memo. 1988-445; Shebester v. Commissioner, T.C. Memo. 1987-246. For example, in Underwood v. Commissioner, supra, the taxpayers

were the sole shareholders of two corporations engaged in the retail barbecue business. One of the corporations, an S corporation, was consistently unprofitable. The other corporation, a C corporation, was consistently profitable. Over the course of approximately 22 months, the C corporation had made loans totaling $110,000 to the S corporation, which were memorialized by a series of promissory notes. The taxpayers' accountant informed the taxpayers that their losses from the S corporation would exceed their adjusted basis in the S corporation and advised them to increase their basis in the S corporation so they could utilize the losses. In an arrangement, not unlike the one herein, the C corporation surrendered the notes of the S corporation to the S corporation, the taxpayers substituted their personal note to the C corporation, and the S corporation gave its demand note to the taxpayers. The Court of Appeals for the Fifth Circuit, affirming the decision of this Court, determined that the taxpayers were not entitled to increase their basis in the S corporation as a result of the arrangement.

In reaching its decision, the Court of Appeals for the Fifth Circuit discussed the focus of Congress at the time section 1374(c)(2)(B), the predecessor to section 1366(d)(1), was enacted, referring initially to the following statement in the legislative history:

The amount of the net operating loss apportioned to any shareholder pursuant to the above rule is limited under section 1374(c)(2) to the adjusted basis of the shareholder's investment in the corporation; that is, to the adjusted basis of the stock in the corporation owned by the shareholder and the adjusted basis of any indebtedness of the corporation to the shareholder.  * * * [S. Rept. 1983, 85th Cong., 2d Sess. (1958), 1958-3 C.B. 922, 1141.]

The Court of Appeals then went on to conclude:

In the transaction at issue in this case, the taxpayers in 1967 merely exchanged demand notes between themselves and their wholly owned corporations; they advanced no funds to either Lubbock or Albuquerque. Neither at the time of the transaction, nor at any other time prior to or during 1969 was it clear that the taxpayers would ever make a demand upon themselves, through Lubbock, for payment of their note.  Hence, as in the guaranty situation, until they actually paid their debt to Lubbock in 1970 the taxpayers had made no additional investment in Albuquerque that would increase their adjusted basis in an indebtedness of Albuquerque to them within the meaning of section 1374(c)(2)(B).  * * * [Underwood v. Commissioner, supra at 312; fn. refs. omitted.]

In Shebester v. Commissioner, supra, the taxpayer was a majority shareholder in two S corporations, A & L and Hennessey. In late 1979, the taxpayer assumed the liability of A & L to Hennessey.  A & L's books were adjusted with a debit to accounts payable and a credit to notes payable.  Hennessey's books were adjusted with a debit to the taxpayer's drawing account and a credit to accounts receivable.  At the end of the year, the taxpayer's drawing account was closed by debiting the taxpayer's undistributed taxable income account in an amount including the amount of the debt assumed.  We concluded that the charge to the

taxpayer's drawing account was not an actual economic outlay stating:

> [The taxpayer's] bookkeeping maneuvers merely shifted, on paper, the liability for prior loans.  Hennessey's debit to * * * [the taxpayer's] drawing account, and its subsequent credit to that account and debit to * * * [the taxpayer's] undistributed taxable income account, do not reflect a current economic outlay entitling * * * [the taxpayer] to increase his basis in A & L.  Although the entries in Hennessey's books technically reduced * * * [the taxpayer's] book equity, such entries could not, absent liquidation of Hennessey, leave * * * [the taxpayer] "poorer in a material sense."  * * * [Shebester v. Commissioner, supra; citation omitted.]

Furthermore, petitioners' reliance on Rev. Rul. 75-144, 1975-1 C.B. 277, is misplaced.  The Court of Appeals in Underwood v. Commissioner, 535 F.2d 309 (5th Cir. 1976), noted the ruling as applied to situations such as is involved here, stating:

> In the ruling [Rev. Rul. 75-144] the obligee on the shareholder's note was an outsider, a bank, which stood ready to enforce the obligation.  Hence it was clear at the time the substitution occurred that at some future date payment would be required.  Here, by contrast, the obligee on the taxpayers' demand note was their own wholly-owned corporation.  * * * [Underwood v. Commissioner, supra at 312 n.2.]

After considering the reasoning set forth in the cases discussed above and the dearth of evidence establishing the substance of the transactions between SLPC, TPC, and Rose, we conclude that the only intended economic effect of these transactions was to enable the Roses to deduct losses from SLPC on their joint income tax returns for 1994 and 1995 that they

would not have otherwise been able to deduct.  At the time that these transactions were consummated, no party either advanced or received any funds.  Rather, the transactions occurred through offsetting book entries.  Furthermore, there is no evidence that indicates whether a bona fide debt existed between TPC and Rose prior to the occurrence of these transactions or whether TPC had paid Rose any of the amounts that it owed to him, and we are unpersuaded that the evidence establishes that SLPC paid Rose any of the amounts that it owed to him after these transactions occurred.  Because these transactions did not leave Rose poorer in a material sense when fully consummated, we conclude that Rose did not make an actual economic outlay by engaging in them. Accordingly, we sustain respondent's determination that the Roses had an insufficient basis in their SLPC interest during 1994 and 1995 to deduct the losses that they claimed from that S corporation on their joint income tax returns for those years.

Issue #8--Reasonable Compensation

Section 162(a)(1) allows as a deduction "a reasonable allowance for salaries or other compensation for personal services actually rendered".  The test for deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services.  Sec. 1.162-7(a), Income Tax Regs.  In any event, the allowance for the compensation paid may not exceed what is reasonable under all the

circumstances.  Sec. 1.162-7(b)(3), Income Tax Regs.  Reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances.  Id.

Whether an expense that is claimed pursuant to section 162(a)(1) is reasonable compensation for services rendered is a question of fact that must be decided on the basis of the particular facts and circumstances.  Paula Constr. Co. v. Commissioner, 58 T.C. 1055, 1058-1059 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973); see also Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, 528 F.2d 176, 179 (10th Cir. 1975), affg. 61 T.C. 564 (1974); Pac. Grains, Inc. v. Commissioner, 399 F.2d 603, 605 (9th Cir. 1968), affg. T.C. Memo. 1967-7.  There are no fixed rules or exact standards for determining what constitutes reasonable compensation.  Golden Constr. Co. v. Commissioner, 228 F.2d 637, 638 (10th Cir. 1955), affg. T.C. Memo. 1954-221.  When the case involves a closely held corporation with the controlling shareholders setting their own level of compensation as employees, the reasonableness of the compensation is subject to close scrutiny.  Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1324 (5th Cir. 1987), affg. T.C. Memo. 1985-267; see also Tulia Feedlot, Inc. v. United States, 513 F.2d at 805; Golden Constr. Co. v. Commissioner, supra at 638.

In these cases, the parties dispute the reasonableness of the total compensation paid to Rose by PK Ventures and its subsidiaries during 1992 and 1993 and deducted by PKV&S on its consolidated income tax returns for those years. Petitioners contend that the amounts that PKV&S deducted as compensation paid to Rose in 1992 and 1993 were reasonable because (1) a significant portion of these amounts was intended to be deductible as compensation for services that Rose performed for PK Ventures and its subsidiaries during 1986 through 1991 and (2) an analysis of the facts and circumstances of these cases establish that these amounts were reasonable. Conversely, respondent contends that the amounts that PKV&S deducted as compensation paid to Rose in 1992 and 1993 were not reasonable because (1) petitioners have failed to establish that a significant portion of these amounts was intended to be deductible as compensation for services that Rose performed for PK Ventures and its subsidiaries during 1986 through 1991 and (2) the testimony provided by petitioners' expert witness establishes that these amounts were not reasonable. We address the parties' contentions below.

Petitioners contend that a significant portion of the compensation that Rose received from PK Ventures and its subsidiaries during 1992 and 1993 was intended to be deductible as compensation for services that Rose performed for those

corporations during 1986 through 1991.  In support of this contention, petitioners argue that (1) respondent's determination in the PKV&S notice of deficiency and paragraph 51 of the Stipulation of Facts establish that a portion of the compensation deducted by PKV&S on its consolidated income tax returns for 1992 and 1993 is attributable to deferred compensation that was paid to Rose during those years and (2) Rose was insufficiently compensated for his services to PK Ventures and its subsidiaries during 1986 through 1991.  As discussed below, petitioners' arguments are unpersuasive.

Paragraph 51 of the Stipulation of Facts recites the following:

> 51.  As is reflected in the notice of deficiency, the respondent determined that PK Ventures is entitled to a 1992 deduction for compensation for Rose in the amount of $438,055, which consists of $143,317 of then-current compensation and $294,738 of deferred compensation.  The notice of deficiency also reflects the determination of the respondent that PK Ventures is entitled to a 1993 deduction for compensation for Rose in the amount of $139,141, all of which is then-current compensation.

Paragraph 51 of the Stipulation of Facts does not add anything to respondent's determination, and it does not establish that respondent's determination is correct.  Because our conclusions as to deductible amounts are based on the evidence and not on any alleged concession as to deferred compensation, petitioners' argument as to the effect of this stipulation and of respondent's determination in the PKV&S notice of deficiency is unpersuasive.

Notwithstanding this conclusion, we do not allow respondent to disavow the amount allowed in the PKV&S notice of deficiency for "deferred compensation" paid to Rose in 1992 (as respondent attempts to do on brief) because to do so would be to permit respondent to increase the related deficiency without making a timely claim for it.  See sec. 6214(a); Estate of Petschek v. Commissioner, 81 T.C. 260, 271-272 (1983); see also Koufman v. Commissioner, 69 T.C. 473, 475-476 (1977).

Under certain circumstances, prior services may be compensated in a later year.  Lucas v. Ox Fibre Brush Co., 281 U.S. 115, 119 (1930).  In such instances, however, the taxpayer must establish that there was not sufficient compensation in prior periods and that, in fact, the current year's compensation was to compensate for that underpayment.  Estate of Wallace v. Commissioner, 95 T.C. 525, 553-554 (1990), affd. on another ground 965 F.2d 1038 (11th Cir. 1992); see also Pac. Grains, Inc. v. Commissioner, supra at 606.

In support of their argument that Rose was insufficiently compensated for his services to PK Ventures and its subsidiaries during 1986 through 1991, petitioners claim that a deferred compensation agreement existed between Rose and those corporations during those years and that the "going concern" notes included in the notes to the audited financial statements for the year ended December 31, 1989, for PK Ventures, SLPC,

TBPC, and TPTC establish the existence of this deferred compensation agreement. These notes state that each corporation's "management extended payment terms related to certain accrued payables such as officer's salaries, indefinitely, subject to cash availability." There is no indication in these notes as to the period of time, other than 1989, to which these extended payment terms relate or to the amount or percentage of compensation that was not paid to Rose. Moreover, there is no evidence of corporate resolutions and/or other agreements by PK Ventures, SLPC, TBPC, or TPTC that set forth the terms of these extended payment arrangements. In addition, PKV&S's audited consolidated financial statements for the years ended December 31, 1990, through December 31, 1993, made no reference to any extended payment arrangements or to any deferred compensation arrangement with Rose, and there was no liability for deferred compensation reported on the Schedules L attached to PKV&S's consolidated income tax returns for 1992 and 1993.

When questioned on cross-examination about the existence of a deferred compensation agreement, Rose testified as follows:

> Q [By respondent's counsel] Did you have an
> agreement as of the end of 1991 between yourself and
> PK Ventures to defer your compensation for 1991 and
> prior years?
>
> A [By Rose] Being a small company, conceptually,
> what we did was the real deal. And the real deal was--
> is I did not pay myself, so I deferred it.

Q  Did you have an agreement--

A  Well, an agreement as a written agreement?  No, sir.

Q  Did you have an understanding, sir, that you were entitled to compensation in 1991 and that you, as PK Ventures, were going to defer that amount into the next or subsequent years?

A  I don't believe I had an agreement.  I knew I wanted to be paid.

The lack of documentation in the corporate records of PK Ventures and its subsidiaries and Rose's testimony at trial significantly undermine the inference that petitioners wish for us to draw from these "going concern" notes.  Consequently, we conclude that these notes do not establish the existence of a deferred compensation agreement between Rose and PK Ventures and its subsidiaries during 1986 through 1991.  After considering the testimony and lack of evidence supporting petitioners' position, we conclude that no deferred compensation agreement existed between Rose and PK Ventures and its subsidiaries during those years.

As additional support for their argument that Rose was insufficiently compensated for his services to PK Ventures and its subsidiaries during 1986 through 1991, petitioners claim: "Rose did not receive any compensation from Ventures and its subsidiaries for 1986, 1987, and 1988.  In 1989, Ventures paid Rose $170,000, and in 1990, Rose was paid $50,068.  In 1991, Ventures paid Rose $140,469."  In sum, petitioners claim that

Rose was paid $360,537 for his services to PK Ventures and its subsidiaries during 1986 through 1991. The record establishes, however, that Rose received $740,537 for his services to PK Ventures and its subsidiaries during 1986 through 1991. In addition, PK Ventures provided health insurance to Rose and his family during those years, PK Ventures provided Rose with a company car beginning in 1991, and Rose received equity interests in both PK Ventures and PKVI LP as part of his compensation for organizing those investment opportunities for Printon Kane. Accordingly, petitioners' assertion is incomplete and inaccurate.

Petitioners also claim that the amounts of deferred compensation listed in PK Ventures' general ledger for 1992 establish that Rose was not sufficiently compensated for the services that he performed for PK Ventures and its subsidiaries during 1986 through 1991. After considering, inter alia, Rose's testimony as to the manner in which he "calculated" the deferred compensation amounts listed in PK Ventures' general ledger for 1992, the lack of any contemporaneous accounting for these amounts prior to 1992, and the failure to list these amounts as liabilities in both PKV&S's consolidated financial statements and consolidated income tax returns, we are not persuaded that these amounts represented compensation that Rose was owed for his services to PK Ventures and its subsidiaries during 1986 through 1991. Rather, we conclude that the health insurance, company

car, and $740,537 that Rose received from PK Ventures and its subsidiaries, along with the equity interests that Rose received in PK Ventures and PKVI LP, were sufficient compensation for his services to PK Ventures and its subsidiaries during 1986 through 1991.

We conclude that no portion of the amounts that PKV&S deducted as officer compensation on its consolidated income tax returns for 1992 and 1993 is attributable to deferred compensation. Therefore, we must decide whether the $1,646,948 that PKV&S deducted in 1992 and the $2,031,933 that PKV&S deducted in 1993 were reasonable amounts of compensation for the services that Rose performed for PK Ventures and its subsidiaries during those years.

The cases contain a lengthy list of factors that are relevant when considering the reasonableness of the compensation deductions claimed by a business, including: (1) The employee's qualifications; (2) the nature, extent, and scope of the employee's work; (3) the size and complexities of the business; (4) a comparison of salaries paid with gross income and net income; (5) the prevailing general economic conditions; (6) a comparison of salaries with distributions to stockholders; (7) the prevailing rates of compensation for comparable positions in comparable concerns; (8) the salary policy of the taxpayer as to all employees; and (9) the amount of compensation paid to the

particular employee in previous years.  Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1156 (1980); see also Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d at 1323; Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, 528 F.2d at 179; Commercial Iron Works v. Commissioner, 166 F.2d 221, 224 (5th Cir. 1948), affg. a Memorandum Opinion of this Court.  No single factor is determinative.  Home Interiors & Gifts, Inc. v. Commissioner, supra at 1156; see also Owensby & Kritikos, Inc. v. Commissioner, supra at 1323; Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner, supra at 179.

Each party presented expert testimony in support of its positions on reasonable compensation levels.  We are not bound by the opinion of any expert when the opinion is contrary to our own judgment.  Bausch & Lomb, Inc. v. Commissioner, 92 T.C. 525, 597 (1989), affd. 933 F.2d 1084 (2d Cir. 1991); see also Estate of Hall v. Commissioner, 92 T.C. 312, 338 (1989); Chiu v. Commissioner, 84 T.C. 722, 734 (1985).  We may embrace or reject expert testimony, whichever in our judgment is most appropriate.  Helvering v. Natl. Grocery Co., 304 U.S. 282, 295 (1938).  Thus, we are not restricted to choosing the opinion of one expert over another but may extract relevant findings from each in drawing our own conclusions.  Estate of Hall v. Commissioner, supra at 338.  Here, the experts' usefulness is primarily in the data that they collected and analyzed.

Petitioners' expert, Dr. Keith R. Ugone (Ugone), performed an analysis that focused on determining an amount of total compensation that was reasonable for the services that Rose performed for PK Ventures and its subsidiaries during 1987 through 1993. In so doing, Ugone assumed that a deferred compensation agreement existed between Rose and PK Ventures and its subsidiaries during those years. As discussed above, that assumption was unwarranted. As part of this analysis, however, Ugone determined amounts of "reasonable compensation based upon market data" for the services that Rose performed for PK Ventures and its subsidiaries during 1992 and 1993.

In determining the amounts of "reasonable compensation based upon market data", Ugone identified public companies that were similarly situated to PK Ventures during those years. Ugone identified 10 companies for purposes of his analysis for 1992 and 1993. Ugone also considered data published in several different executive compensation surveys in his analysis. Based upon the entirety of his analysis, Ugone concluded that reasonable compensation amounts for the services that Rose performed for PK Ventures and its subsidiaries during 1992 and 1993 were $360,067 and $366,391, respectively.

Respondent's expert, Paul R. Dorf (Dorf), identified a "peer group" of public companies that were similarly situated to PK Ventures and whose top executives performed duties similar to

those performed by Rose.  Dorf identified eight companies for purposes of his analysis.  In his analysis, Dorf also considered data published in at least five different executive compensation surveys.  Based upon the entirety of his analysis, Dorf concluded that reasonable compensation amounts for the services that Rose performed for PK Ventures and its subsidiaries during 1992 and 1993 were $383,104 and $362,356, respectively.

Petitioners contend that the compensation that Rose received from PK Ventures and its subsidiaries during 1992 and 1993 was reasonable based on an analysis of the following factors: (1) Dividend history; (2) past and present financial conditions; (3) nature, extent, and scope of employee's work; (4) complexity of employer's business; (5) risk assumed by the employee; and (6) employee's qualifications and training.  Petitioners attempt to discount the determinations of reasonable compensation made by their own expert by arguing that his determinations reflect a conservative approach.  Petitioners also attempt to discredit the determinations of reasonable compensation made by respondent's expert by calling his determinations "facially suspect".  Furthermore, petitioners argue that there is no consensus in the determinations made by Ugone and Dorf.  Conversely, respondent contends that "there is an expert consensus as to reasonable compensation for the duties that Rose performed on behalf of PK Ventures during 1992 and 1993."  Respondent concludes that

PKV&S should be limited to deducting the reasonable compensation amounts determined by Ugone for 1992 and 1993. We consider these contentions below.

We agree with petitioners that a number of factors must be considered when deciding whether compensation is reasonable in situations such as the one presented here. With respect to the factors cited by petitioners, our review of both experts' reports leads us to the conclusion that they considered many of these factors as well as others in making their determinations as to reasonable compensation amounts for 1992 and 1993. In particular, we note the following excerpt from Dorf's report:

> In gathering relevant company data, identifying market data, conducting our analyses, and ultimately rendering our expert opinion, we considered the following issues:
>
> 1. What were Mr. Rose's qualifications?
>
> 2. What were Mr. Rose's duties and responsibilities at PKV?
>
> 3. What was the financial performance of PKV during the period 1987 through 1991?
>
> 4. What was Mr. Rose's compensation during the period 1987 through 1993?
>
> 5. How was Mr. Rose's compensation determined?
>
> 6. What was the market value of Mr. Rose's position during 1987 through 1993?
>
> 7. How did Mr. Rose's compensation compare to the market value of similar position(s)?
>
> 8. Was there a deferred compensation plan in place at PKV?

Accordingly, we are unpersuaded that we should deviate from the reasonable compensation amounts determined by the experts in these cases. Rather, we conclude that these expert reports establish a consensus as to the amounts of compensation that were reasonable for the services that Rose performed for PK Ventures and its subsidiaries during 1992 and 1993. Because the experts' calculations lead to approximations, in any event, and because Rose's services to PK Ventures and its subsidiaries were obviously substantial, we give him the benefit of the higher of the amounts determined by the experts.

Using our best judgment on the entire record, we conclude that, for 1992 and 1993, reasonable compensation for Rose is $383,104 and $366,391, respectively. Therefore, for 1992, PKV&S is limited to deducting $383,104 for compensation paid to Rose plus an additional $294,738 to reflect the amount allowed by respondent in the PKV&S notice of deficiency for "deferred compensation". For 1993, PKV&S is limited to deducting $366,391 for compensation paid to Rose.

Issue #9--Penalties

Respondent determined accuracy-related penalties with respect to the Roses under section 6662(a) for substantial understatements of income tax on their joint income tax returns for 1990 through 1993. Under section 6662(a), a taxpayer may be liable for a penalty of 20 percent on the portion of an

underpayment of tax due to, inter alia, any substantial understatement of income tax. Sec. 6662(b)(2). An understatement of income tax is "substantial" if it exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A). An "understatement" is defined as the excess of the tax required to be shown on the return over the tax actually shown on the return, less any rebate. Sec. 6662(d)(2)(A).

The section 6662(a) penalty will not be imposed with respect to any portion of the underpayment as to which the taxpayer acted with reasonable cause and in good faith. Sec. 6664(c)(1); see also Higbee v. Commissioner, 116 T.C. 438, 448 (2001). The decision as to whether a taxpayer acted with reasonable cause and in good faith is made by taking into account all of the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Relevant factors include the taxpayer's efforts to assess his or her proper tax liability, including the taxpayer's reasonable and good faith reliance on the advice of a tax professional. See id.

Petitioners argue that the accuracy-related penalties should not be imposed against the Roses because "respondent is unable to carry his burden of production as to the penalty pursuant to the requirements of IRS sec. 7491(c)." Petitioners further argue that "respondent has failed to adequately consider the reasonable cause prong of the penalty provision" because "Rose relied on the

information returns furnished by Ventures and Limited and filed his returns consistent with the information returns received from those entities."  As discussed below, petitioners' arguments are unpersuasive.

Section 7491 applies to court proceedings arising in connection with examinations commencing after July 22, 1998. Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c)(1), 112 Stat. 727.  The record in these cases establishes that respondent's examination of the Roses' joint income tax returns began before July 22, 1998. Furthermore, the record in these cases negates reasonable cause. The Roses conceded that they failed to report a number of items of income on their joint income tax returns for 1990 through 1993.  Contrary to petitioners' argument, the evidence does not establish that the Roses' failure to report these items of income was the result of Rose's reliance on the tax professionals that prepared the returns for PKV&S, PKVI LP, or Zephyr.  In addition, the evidence establishes that the Roses' inability to calculate the bases of their interests in PKVI LP and Zephyr and to claim losses from those entities in the correct amounts and in the correct years did not result from the Roses' reliance on the information that was reported on the Schedules K-1 that they received from those entities.  The evidence also establishes that Rose was well versed in corporate finance and that he made the

decisions regarding the terms and structure of the cash transfers involving PK Ventures and its subsidiaries, PKVI LP, Zephyr, and the Zephyr purchasers.  Consequently, any argument as to Rose's reliance on the advice of tax professionals for the treatment of these cash transfers as debt rather than equity contributions or distributions is unconvincing.

Based upon our analysis of the relevant facts and circumstances of these cases, we conclude that respondent's imposition of accuracy-related penalties against the Roses must be sustained if the recalculation of the Roses' income tax liabilities for 1990 through 1993 gives rise to substantial understatements of income tax for those years.

We have considered the arguments of the parties that were not specifically addressed in this opinion.  Those arguments are either without merit or irrelevant to our decision.

To reflect the foregoing and the concessions of the parties,

Decisions will be entered
under Rule 155.